(No. 16653.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM D. BLACK *et al.* Plaintiffs in Error.

*Opinion filed June 18, 1925.*

1. CRIMINAL LAW—*improper conduct of counsel is not always cured by sustaining objections.* Improper conduct of attorneys for the State in asking improper questions or making uncalled-for remarks for the sole purpose of prejudicing the accused in the minds of the jury constitutes error which cannot always be cured by the court sustaining objections.

2. SAME—*the prosecution cannot resort to unfair and improper methods to secure a conviction.* If the evidence of guilt is such that the State's attorney believes a conviction is warranted it is his duty to try to secure a verdict of guilty by a proper and forceful presentation of the case to the jury, both in the introduction of testimony and in the argument, but it is never the duty of the State's attorney to resort to unfair and improper methods to secure a conviction.

3. SAME—*accused is entitled to fair and impartial trial.* All defendants, whether they be good or bad, guilty or innocent, are entitled to a fair and impartial trial, and it is the duty of the court to see that such trial is had, and even though there be enough competent evidence in the record to convict, a defendant has a right to a trial by a jury and not by a reviewing court.

4. SAME—*what argument of State's attorney is improper.* The duty of the State's attorney to treat the defendant fairly applies to his argument to the jury as well as to the introduction of evidence, and while it is proper to argue a belief that the evidence warrants a conviction and that the State's witnesses are more credible than those for the defendant, it is improper for the State's attorney to express in his argument to the jury his own individual opinion or belief of the defendant's guilt except as that opinion is based on the evidence.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES A. WILLIAMS, Judge, presiding.

FRANK E. CANTWELL, and CLARENCE DARROW, (CLYDE C. FISHER, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

The Lansing State Bank, in Lansing, Cook county, was robbed about ten o'clock A. M. January 16, 1924. Four men entered the bank with guns, ordered the persons in the bank to hold up their hands and robbed the bank of $9381 in currency. The robbers then escaped in an automobile. William D. Black and Robert Mattingly were subsequently indicted for the robbery. Black was arrested in Colorado and Mattingly in Minnesota. They waived extradition and were brought back to Cook county, where they were tried in October, 1924, found guilty and sentenced to imprisonment in the penitentiary. They have sued out a writ of error to review the judgment, and rely for a reversal principally on the grounds that the evidence was not sufficient to prove guilt beyond reasonable doubt; that defendants were prevented from having a fair trial by the misconduct of the State's attorney in his management of the trial of the case; that the jury were prejudiced and influenced against defendants by the unwarranted acts of the State's attorney, and by the court erroneously permitting the State's attorney to interrogate defendants and their witnesses about other crimes in no way connected with the charge in the indictment.

For the People, the cashier of the bank, Henry Schultz, testified that about ten o'clock the morning of January 16, 1924, four robbers entered the bank. There were in the bank at the time, besides witness, William Winterhoff, Alice Defries and Amanda Stiles, employees of the bank, and Frank Wachewicz. Witness and Wachewicz were in the conference room. Defendant Black pointed a gun at them,

told them to hold up their hands, and if they made a false
move they would be shot. They held up their hands and
were then ordered to face the wall. After facing the wall
a minute or two they were ordered into a clothes closet by
Black and defendant Mattingly, and were in there three or
four minutes while the bank's money was being taken by
the robbers. Mattingly asked witness for the bank's guns
and ordered him to get them, which he did. During the
robbery there were two shots fired and a man named Beck-
man was hit. Witness had not previously met or known
either of the defendants. He testified he identified Black
after his arrest, at the police station. He first saw him in
a cell and later in a room. He identified Mattingly as one
of the robbers. He first saw him after the robbery in a
room of the Calumet city judge. He had never seen either
of the men before the robbery, and never saw them after
the robbery until he identified them at the police station
and in the city judge's room.

Frank Wachewicz testified he was in the bank when it
was robbed. He had not before that known either of de-
fendants but identified both of them as the men who robbed
the bank. He said Black had on a dark-gray cap and a
dark-colored short coat. He next saw him at the police sta-
tion after his arrest, behind the bars, and recognized him
as one of the robbers. At the bank he noticed Mattingly
had a peculiar look and mean brown eyes. Nothing else
about him attracted witness' attention. He had on a soft
dark-gray hat.

A. E. Lucas testified for the People that he lived at
Lansing, and on the 16th day of January, 1924, about ten
o'clock, he was standing in front of the bank when a big,
maroon Cadillac car stood just in front of the bank door.
A man was in the front of the car and had some kind of a
gun in his lap. Witness saw four men come out of the
bank and get into the car. He recognized Black as one of
the men who came out of the bank carrying a sack that

seemed full. They came out of the door one at a time, got into the car and drove east toward Gary. Witness was about forty feet from the man he identified as Black, who wore a medium dark overcoat and cap. The man witness saw looked like Black, but he saw no particular mark about his face or complexion except that he was dark. He next saw him in the police station and thought it was the same man. Witness could not identify either of the four men except Black. That was because they had their hats pulled down and their collars turned up.

Joseph Nitz testified he is a police officer and on the 9th of February arrested Mattingly at Winona, Minnesota, and brought him back. On the trip back Mattingly denied knowing anything about the robbery, and claimed he was in Gary, fourteen miles from Lansing, when the robbery was committed. Witness never knew Mattingly prior to arresting him. Mattingly said he was in a hotel in Gary at the time of the robbery; that his wife and little boy lived at the hotel. Witness learned through Mattingly that Black had been in Winona, but he was gone when witness arrived there.

W. L. Rodgers, a police officer of Gary, testified he arrested Black in Leadville, Colorado, and brought him back to Cook county. He asked Black if he had been in Lansing a few days before the robbery, and Black said he was at Bob Simmons' place. Over objections of defendants' counsel the court permitted the State's attorney to ask, and the witness to answer, the question as to who Bob Simmons is. The answer was, "He runs a blind pig, or whatever you want to call it." Witness testified Simmons ran a blind pig in Gary until he was closed up and chased out. On motion of defendants' counsel the court ordered that answer stricken out. The State's attorney insisted the answer that Simmons ran a blind pig should remain in the record, and the court said, "Disregard the blind pig as the business that this man was in."

On behalf of defendants Hannah Black testified she lived in Gary and is a sister of Black. The last time her brother was in Gary was January 10, and she never saw him again until he was arrested, in February. He was in an automobile accident about Christmas, 1923, and had to have stitches taken in his head, and his ear was cut.

Edward McCutcheon, for defendants, testified he is nineteen years old and lives at Superior, Wisconsin. He first met Black on January 14, 1924, when he was a guest at the Culver Hotel, in Ashland, Wisconsin, at which hotel witness was the clerk. Black registered at the hotel January 14, 1924. The register sheet of the hotel shows the name of Black on that date and that he arrived there before supper. Another page of the register sheet dated January 19, 1924, contains the signature of Black and wife, Gary, Indiana, for lodging, and they were assigned to room 58. Witness testified he saw Black write his name January 14 and assigned him to a room and carried his suitcase to the room. He met Black in the lobby of the hotel and became acquainted with him. He noticed a scar on his ear, which looked like it was the result of a cut of some kind and was very noticeable. Black was in the hotel on the day of January 15, and that night Lowe, the bus driver, whose headquarters were at the hotel, was talking about making a trip to Superior, eighty-seven miles from Ashland. He asked witness if he would not like to go along. Superior was witness' home and his vacation of one week started that day. Witness planned to go with Lowe, and in talking with Black asked him if he would like to go along. Black said he would, and after supper they started and arrived at Superior before midnight. Witness lived there with his mother, brother and sister. He and Black went to his mother's house and stayed all night there. They occupied a room together. He and Black had dinner at witness' mother's on January 16. Felix Idziorek was there. He was taking his meals at witness' mother's. A sister of witness' mother and

a cousin of hers, as well as his brother and sister, were at the house at the time he and Black were there. He and Black went to the office of a lawyer in Superior, named Elmer S. Geraldson, the afternoon of January 16 and remained at the lawyer's office about half an hour. They went to witness' home in Superior that night and slept in the same room. Idziorek was there and had dinner with witness, Black, and a brother and sister of witness the next day. The following day, January 17, they took the bus back to Ashland with Lowe and arrived there after supper. Black occupied the same room in the hotel he occupied before they went to Superior and stayed in Ashland until the 19th of January, when his wife arrived at the hotel. Black registered himself and wife January 19, but witness was not present at the time he registered. The proprietor had charge of the register at that time. Witness had never seen Black prior to January 14, 1924. Witness' uncle was proprietor of the hotel.

Elmer S. Geraldson, for defendants, testified he is a lawyer at Superior. He recalled seeing Black at his office January 16, 1924. Had never seen him before. Black was at witness' office between three and four in the afternoon. Superior is between five and six hundred miles from Chicago. Black came to witness' office with Edward McCutcheon, who came to consult with witness about attaching an automobile. Witness prepared the attachment papers for McCutcheon. McCutcheon represented his mother in the business of the proposed attachment of the automobile. He told witness it was his mother's business. Witness knew the mother, and she was a client of his. Someone owed her a board bill.

Harry Lowe testified for defendants that he lived in Superior. He met Black on January 14, 1924, at the Culver Hotel, in Ashland. Black told witness about his automobile accident near Christmas time. His ear was not healed. January 15 McCutcheon and Black went with wit-

ness to Superior.   On arriving there witness let them out
of his bus at the home of McCutcheon.   He met Black and
McCutcheon on the street next day about 3:00 o'clock, be-
fore his bus left for Ashland at 3:30.   He next saw Black
January 17, about 3:30 in the afternoon, in front of the
Superior Hotel.   Black went with witness from there to
Ashland, where they arrived at about 6:30 in the evening.
Witness saw Black in Ashland the 18th and 19th of Janu-
ary.   Black was introduced to witness the first time he
met him, at the Culver Hotel at Ashland, by McCutcheon.
Black said he was looking for the location of a hotel.

At this point in the trial one of counsel for defendants
stated they expected to prove that before the bank robbery
Mrs. Black, wife of defendant Black, drew out of the Scott
County Savings Bank of Davenport, Iowa, $1030 and came
to Gary with the money.   Counsel said he made the state-
ment so the State might have an opportunity, before the
case was closed, to ascertain the truth of that testimony.

Mrs. Frieda McCutcheon testified she lived in Superior,
was the mother of three children, and kept roomers and
boarders.   Black came to her house with her son, Edward,
after ten o'clock the night of January 15 and stayed at her
home until the 17th of January.   She had never seen Black
before.   He was introduced to her by her son.   Black and
Edward slept in the same room.   She called them about
eleven o'clock in the morning, and they got up and ate din- ·
ner.   Mrs. Eli, a cousin of witness, and Mrs. Luchenville,
her sister, also a little boy and girl, Black and Edward, had
dinner together January 16.   A roomer and boarder named
Leo Idziorek was also there.   Black and Edward left the
house somewhere about 2:30 in the afternoon.   She asked
her son to see lawyer Geraldson about attaching an auto-
mobile for a board bill a man owed her.   She did not see
her son any more that day but saw him and Black the fol-
lowing day.   They slept at her house the night of Janu-
ary 16.   She observed the scar on Black's ear.   He said he

317—39

got it in an automobile accident. They took the bus back
to Ashland on January 17. She wrote her son a letter
dated January 18, which was introduced in evidence. She
testified she mailed it January 18 too late to get it on the
4:30 P. M. train for Ashland. The envelope was stamped
at Superior, Wisconsin, January 19, 1924, and addressed to
Edward McCutcheon at Ashland. In the letter she spoke
of the visit of her son and his friend and inquired what
time they got back. She also said she had a letter "from
Herb and Sparkey, so I don't think I will trouble with his
car unless he fails to do as he had agreed to do."

Black testified in his own behalf and denied he had any-
thing to do with the bank robbery. He testified he left
Gary on January 9. He was never in Lansing in his life.
He had a severe automobile accident about Christmas time,
1923, and sustained bruises and cuts which necessitated six
stitches being taken,—five in his head and one in his ear.
He had formerly lived in Davenport, Iowa. His wife came
to Gary on January 6 and brought with her $850 drawn
from the bank there. They decided to leave Gary and look
for a location for business. They went to Chicago Heights,
where they remained two days, and from there to Ironwood,
Michigan, and stopped at the St. James Hotel, registering
as W. D. Black. His wife went to see a friend of hers in
Hurley, Wisconsin. Ironwood and Hurley are connected by
a bridge. Witness said he went to Ashland the 14th and
registered at the Culver Hotel about 2:30 in the after-
noon. He recognized his signature on the hotel register.
The night of the 15th he and the clerk, McCutcheon, went
with Lowe, the bus driver, to Superior, where McCutcheon's
mother lived. He testified he, himself, was looking for a
location for a hotel. They spent the night at McCutcheon's
mother's house, got up the next morning about 10:30 and
had dinner there. There were some ladies present at the
dinner,—one of them Mrs. McCutcheon's sister and the
other some relative. There was also a boy and girl at din-

ner.  About 2:30 in the afternoon he and McCutcheon went up-town.  They visited the office of lawyer Geraldson, who was the State's attorney, and probably remained in his office thirty minutes or more.  He and McCutcheon played pool and had something to eat at a cafe and returned to Mrs. McCutcheon's house about 10:30, where they slept in the same room that night.  They got up the next morning about 10:30 or 11:00 o'clock and had dinner there.  About 2:30 they left Mrs. McCutcheon's home to go to the bus to return to Ashland that evening.  He testified his wife came to Ashland on January 19 and he took her to the Culver Hotel, where they registered and were given a room.  On the 20th they left Ashland and went to Winona, Minnesota. They stopped there at the Park Hotel, where they stayed one day and then went to the Ludwig.  They were at Winona ten days, when his wife returned home and he went to Sioux City, Iowa, where he stopped over night at the Star Hotel, and from Sioux City he went to Leadville, Colorado.  He testified he registered at every hotel he stopped as W. D. Black.  He was arrested in Leadville on February 2.

Mattingly testified he was thirty-two years old and had lived all his life at South Bend and Gary, Indiana.  He was married and has a boy eight years old.  He had worked about eight months for Black in a soft drink parlor.  He testified he had been in a hospital in December prior to the bank robbery, for alcoholism.  He left the hospital a day or two before Christmas.  His health was very poor after he left the hospital.  He was not in Lansing when the robbery took place but was at his home at the time.  He was living with his mother, brother, nephew, wife and child.  He did not think he left the house January 16 before 12:30 or 1:00 o'clock.  He went down to a soft drink parlor in Gary and played a few games of cards.  He left Gary the 22d or 23d and went to Winona, Minnesota.  He knew Black was there, and went up there to get away from liquor and

get some kind of a job. He had about $12 the day he left Gary and $4 when he was arrested.

Belle Mattingly testified she is the mother of Robert Mattingly and had nine children. She lived in Gary and would be seventy-one years old her next birthday. The son she lived with owned the home and she kept house for him. Another son and his wife and a grandson lived in the house. She testified Mattingly was at home during the forenoon of January 16. His wife went to work at twelve o'clock, and witness and Mattingly had a talk about how long they had been married, which lacked three days of being ten years.

Eugene Mattingly testified he is nineteen years old, lived with his grandmother and attended school in Gary. He testified he remembered a conversation January 16 between his grandmother and Mattingly about the wedding anniversary being three days in the future, and that they would then have been married ten years. Mattingly had been sick and was in his bathrobe.

Felix J. Idziorek, a witness for defendants, testified he lived at Superior, is thirty-two years old and a druggist by occupation. He ran the Culver Hotel, at Ashland, for a while. He did not manage it himself. He was at the hotel in January and is familiar with the register and the way the business was conducted. He remembered Black being at the hotel in January. The hotel was conducted on the American and European plans. He corroborated the clerk, McCutcheon, about the registration of Black, and later of Black and wife, at the hotel, and the room they were assigned to and occupied. Witness attended to some of their requests. He testified Black registered at the hotel on the 14th. He saw him there on the 15th. Before supper time Black left the hotel with Harry Lowe and McCutcheon and did not return to the hotel until supper time, January 17. He was assigned room 62 on January 14. He did not occupy the room the night of January 15 and another guest occupied the room, and Black was not charged

for it although it was kept in his name. Witness remembered Black coming to the hotel January 19 with his wife and saw them register. They were assigned to another and better room than Black had occupied.

Defendants then rested, and plaintiff introduced some rebuttal testimony. Nathan Potts testified he was a detective sergeant at Gary and had known Black three years. He was asked what kind of business Black ran there. Counsel for defendants objected, and the assistant State's attorney said, "I asked him [evidently meaning Black] if he did not run a house of prostitution, and he said no." Counsel for defendants excepted to the remarks and conduct of the assistant State's attorney, and after a conference between court and counsel outside of the hearing of the jury the State withdrew the witness.

Sophia Jakubowski was called by the People in rebuttal. She testified she worked in the Brighton Park State Bank on January 12, 1924, and was in the bank that day about 10:50 or 11:00 o'clock in the morning. Counsel for defendants objected to her testifying and she was withdrawn. It can only be surmised what she was called to testify to. The court had permitted Mattingly, over objection of counsel, to be asked by the State's attorney, on cross-examination, if he was not at the Brighton Park State Bank the morning of January 12, if he did not have a gun in the bank, and if he did not leave the bank that morning in a maroon-colored Cadillac car, to all of which witness answered no. The only apparent purpose for calling Mrs. Jakubowski in rebuttal was to contradict Mattingly's testimony that he was not at the bank at that time. The Lansing State Bank was robbed January 16. It was not stated that the Brighton Park State Bank was robbed January 12; but even if it was, it is not claimed the robbery of the Lansing State Bank had any connection with the robbery of the Brighton Park State Bank or that the same parties robbed both banks.

As this judgment must be reversed for the prejudicial misconduct of assistant State's attorney Milton D. Smith, who tried the case for the People, we will not comment at length on the testimony. It must be conceded that Black proved a rather remarkable alibi by witnesses in no way related to him, who apparently were reputable persons having no interest in Black and no motive to induce them to testify falsely. Besides his own testimony Mattingly produced relatives by blood who testified he was at his home in Gary when the crime was committed in Lansing, fourteen miles distant. On the other hand, Schultz and Wachewicz, who were in the bank at the time of the robbery, and Lucas, who was outside the bank and saw the men come out, get in a car and drive away, identified Black and Mattingly as two of the men who committed the crime. The evidence was of a character that the case should have been tried and submitted to the jury in an orderly manner, unattended by any conduct intended or calculated to inflame the passions or prejudices of the jury without throwing any light on the question of the guilt or innocence of the defendants of the crime charged in the indictment. We have heretofore had occasion more than once to condemn the conduct of the State's counsel in asking improper questions or making uncalled-for remarks which had no bearing on the guilt of the accused of the crime they were being tried for but for the sole purpose of prejudicing them in the minds of the jury, and we have held that the error will not always be cured by the court sustaining objections. *People* v. *Green,* 292 Ill. 351; *People* v. *Chrfrikas,* 295 id. 222; *People* v. *Flynn,* 302 id. 549; *People* v. *Newman,* 261 id. 11; *People* v. *Decker,* 310 id. 234; *People* v. *Lewis,* 313 id. 312; *People* v. *Garines,* 314 id. 413.

It would require much space to describe the manner and conduct of the assistant State's attorney and his improper questions and remarks during the trial, as they were of such frequent occurrence. We shall only refer to two

instances. During the cross-examination of McCutcheon, the clerk of the hotel at Ashland, the assistant State's attorney asked for the register sheets showing Black was at the hotel from January 14 to 19. One of counsel for defendants said the State's attorney could have them after he got through with them. The State's attorney told counsel not to find Black's name as at the hotel January 16, and said the bill clerk would know. Counsel replied the bill clerk was not present. The State's attorney told counsel he could get him,—that he had shown he could get pretty nearly anything. The remark was objected to, and the court merely remarked, "Now, no more of that; let's get along." After some further controversy the court ordered the remark stricken. While Robert Curran, an attorney of Superior, was testifying as a witness for defendants he was asked by their counsel what schools he had attended. The State's attorney objected, and one of counsel for defendants charged him with making an insinuation which counsel said was something funny. The State's attorney replied, "It ought not to be considered queer in your family." Counsel protested at his family being mentioned, and the court said he thought the remarks about counsel's family should go out. The State's attorney said, "He can pat them on the back enough to make up for anything I say."

The above are two of many instances and will serve to illustrate the attitude and conduct of the State's attorney toward opposite counsel. He seemed very antagonistic, especially toward one of defendants' attorneys, and throughout the trial his conduct was very offensive and was apparently directed as much to discrediting and humiliating counsel as to the discharge of his duty to the People in the prosecution of the case. Conceding that counsel for defendants was sometimes provoking, and making allowance for the heat of a contested lawsuit, which we know sometimes provokes remarks and conduct of an attorney which would

not occur in moments of calm and deliberation, we are obliged to say this record shows an unjustifiable offensiveness of the State's attorney throughout the trial. The State's attorney should not allow consideration for any sensitiveness of feeling of defendants' counsel or a desire to refrain from doing or saying anything objectionable toward them to interfere with the proper and forceful presentation of the case to the jury, but the conduct of a trial in a court of justice should be characterized by a degree of dignity and good order. Men charged with crime as defendants were should not be petted by the State and nothing should be permitted to interfere with the presentation of the State's competent evidence in the most effective manner. If the evidence of guilt is such that the State's attorney believes a conviction is warranted it is his duty to try to secure a verdict of guilty, but it is never his duty to resort to unfair and improper methods to secure a conviction. His duty is to present to the jury, both in the introduction of the testimony and in argument to the jury, the evidence of the State upon which he relies, and this can be effectively done in accordance with the rules of law. No special favors are to be shown the defendant, but the law entitles him to a fair and impartial trial upon the evidence, free from any attempt to wrongfully inflame and prejudice the jury against him. The same fair and impartial trial is guaranteed by law to all defendants, whether they be good or bad, guilty or innocent. *People* v. *Newman, supra.*

Deserving of censure as the conduct of the State's attorney referred to was, he did other things which were worse. It will be remembered Lowe was the bus driver who testified he took Black and McCutcheon from Ashland to Superior on January 15 and back to Ashland the 17th. He testified Black said he was looking for a location for a hotel. On cross-examination the State's attorney said to the witness, "As a matter of fact, Mr. Lowe, you weren't talking about any hotels were you? You were talking about

a house of prostitution up there, weren't you?" The court sustained an objection to the question.

When Black, who testified in his own defense, was being cross-examined, he testified he had kept a soft drink parlor and rooming house in Gary but never had a hotel. The State's attorney then asked, "You had a house of assignation?" Counsel for defendants objected, and the State's attorney said, "He said he owned a hotel; I am going to show that it is a house of prostitution." The court ruled he could ask the question, but without waiting for the answer the State's attorney asked the witness, "This particular building that you had in Gary in which you say you had a soft drink parlor; that was a moonshine parlor, wasn't it?" The witness answered it was not and that he did not have a house of prostitution in Gary. The State's attorney then asked Black if his place in Gary was not closed by the police in March, 1923. An objection by defendants' counsel was overruled, and the witness answered he closed the business himself but not on orders of the police. The State's attorney asked the witness, "Did you have any women hustling there?" and he answered no. Counsel for defendants objected, and the court remarked, "He has answered it." Later, on cross-examination, the State's attorney, referring to Black's trip to Winona, asked, "You weren't hustling any women up there were you?" Counsel for defendants objected, and the court said, "Proceed." The witness answered no, and then the State's attorney asked, "As a matter of fact, that has been your business all your life hasn't it?" The witness answered no, and counsel for defendants objected and said he wanted to take an exception to the asking of the question and others of a similar character. The court said, "Yes." The State's attorney also interrogated Mattingly, who testified in his own behalf, as to his associations with certain women. In his argument to the jury the State's attorney referred to defendants as "two hustlers of women,—two men who were working in moon-

shine parlors." Referring to Black saying his wife visited in Hurley, Wisconsin, the State's attorney said, "Do any of you men know Hurley? Do you know it is the toughest town in the United States?" At another point in the argument, after counsel for defendants had objected to a statement of the State's attorney, he said one of defendants' counsel said the State's attorney and his associate (Cronson) were willing to take a long chance in sending defendants to the penitentiary, and continuing said to the jury, "I say to you that if Mr. Cronson and I were not positive we would not ask you to send these men to the penitentiary." Counsel for defendants objected, and stated to the court there were many decisions that the statements were improper. The court overruled the objection. Continuing, the State's attorney said, "and I say we would not take a long chance and send any man to the penitentiary unless we were positive of his guilt." Again counsel for defendants objected, and the court remarked, "Your exception is saved; proceed with the argument."

Other instances of improper conduct of the State's attorney occurred during the trial, but it is unnecessary to refer to them to show that defendants were not accorded a fair and impartial trial, which, whatever their character may have been, they were entitled to under the law of the land. Some objections by defendants' counsel to questions of the State's attorney and his remarks in argument to the jury the court sustained, but generally they were overruled, or the court would simply say, "Proceed," or "Let's get along." It was as much the duty of the court to see that defendants received a fair trial as it was to see that the People had a fair trial. We have held that although there may be enough competent evidence in the record to convict, a defendant has a right to a trial by the jury and not by a reviewing court. (*People* v. *Gardiner*, 303 Ill. 204.) We have also held that where the jury could not reasonably have reached any other verdict than one of guilty, errors

on the trial will not always justify a reversal. But in this case the evidence was of such a character that there should have been no prejudicial error committed on the trial.

In some of the cases first above cited the court has stated the law applicable to the conduct of the prosecution in attempting to show or impress the jury that the defendant is a bad man generally, and has committed or been accused of committing other offenses in no manner connected with the crime for which he was being tried and which could not possibly throw any light upon his guilt or innocence of the offense.

The rule that it is the duty of the State's attorney to treat the defendant fairly applies to his argument to the jury as well as to the introduction of evidence. Counsel for the State has the right to argue to the jury his belief that the evidence warrants a conviction. It is legitimate argument, if the State's attorney so believes, to tell the jury the State's witnesses told the truth and are more credible than those for the defendant, but it is improper for him to express his own individual opinion or belief of defendant's guilt except as that opinion is based on the evidence. Twice the State's attorney told the jury he would not ask them to send defendants to the penitentiary if he and his associate were not positive of their guilt. That was an improper and prejudicial statement, in view of the evidence. *Williams* v. *United States,* 168 U. S. 382; *People* v. *King,* 276 Ill. 138.

Respect for and obedience to the law cannot be promoted by denying to a defendant charged with crime a fair and impartial trial, and we cannot approve the verdict and judgment in this case for the reason that the conduct of the State's attorney was such that defendants did not receive that kind of a trial.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*