People of the State of Illinois, Plaintiff-Appellee, v.
Samuel Edward Mason, Defendant-Appellant.

Gen. No. 49,995.

First District, First Division.

October 18, 1965.

Emilie N. Wanderer, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Stuart P. Shapiro, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

After a jury trial, defendant, Samuel Edward Mason, was found guilty of the illegal sale of narcotics. He was sentenced to the penitentiary for a term of from ten years to life.

A prior conviction for the same offense was reversed in People v. Mason, 28 Ill2d 396, 403, 192 NE2d 835 (1963), because "the trial court cut off all inquiry on subjects with respect to which the defense was entitled to a reasonable cross-examination. This was an abuse of discretion and prejudicial error." The cause was remanded for a retrial, and the evidence in both trials was substantially the same.

Defendant contends in the instant appeal (1) that he was unduly restricted in his right of cross-examination; (2) that statements of the State's Attorney to the jury were prejudicial and influenced the jury contrary to the weight of the evidence; (3) that the apparent prejudice of the trial court so affected the jury as to cause its verdict to be returned against the defendant; and (4) that the reversal of the judgment

of conviction of the defendant in the first trial became the law of the case and requires that the conviction now appealed from be reversed and the defendant discharged.

The principal witness for the State was Inspector Carl H. Henry of the Illinois State Division of Narcotic Control. He testified that on December 15, 1959, at about 4:00 p. m., an informer brought the defendant to him while he was seated alone, in civilian clothing, in an unmarked State automobile parked at 39th and Ellis in Chicago. Henry was under the surveillance of Narcotic Inspectors Manson and Patch, who were in another parked automobile. During the presence of the informer, Henry told the defendant he would like to purchase three packages of heroin for $15. Defendant "was presently awaiting a source of supply," and they made an agreement to meet later that evening. At 9 o'clock, Henry, alone in the car, returned to the same intersection, again under the surveillance of Inspectors Manson and Patch, and the defendant and the informer reappeared. Henry gave defendant $15 in marked money and received three envelopes from defendant. An agreement was then made for another purchase around 3:30 in the morning. After this, Henry "rendezvoused" with the other two inspectors and a field test was made of one of the packages of white powder.

Inspector Henry further testified that at 3:30 on the morning of December 16, he returned to the same place, with Inspectors Patch and Manson in surveillance. After a half hour, defendant reappeared and entered the automobile. Henry told the defendant that he "wanted $20 worth, or four bags," and gave defendant "$20 of pre-recorded, officially advanced funds." Defendant said to wait and he would return with the drugs. Defendant then entered a building

which was adjacent to where Henry was parked. Fifteen minutes later, defendant returned, "accompanied by another negro male. He leaned into the car, handed me the four packages. At that time the male that was with him stuck his head into the vehicle to look at me. As he did, he stated, to the best of my recollection, 'oh, my God, man, what have you done?'" They both backed up very abruptly and went into the building.

Henry then drove from the intersection and again "rendezvoused" with Inspectors Patch and Manson. They all got into one State vehicle and drove back to the vicinity of 39th and Ellis, where they saw the defendant and the other man walking on Ellis. Inspectors Patch and Manson got out of the car and placed the defendant under arrest. About fifteen minutes had elapsed from the time of the second sale until the time defendant was arrested.

On cross-examination, Henry testified that he was then residing in California and was a salesman for a brewing company. He was interrogated at length as to his various places of employment since leaving the Narcotic Division. He said that he had resigned for "personal reasons." He denied that he had been discharged because he had been "charged with the commission of rape" or because of his personal conduct. He admitted the charge of rape had some connection with his resignation.

The State's other witness was Inspector Thomas E. Manson. At the time of the trial, he was "a customs agent for the United States Treasury Department, Customs Service" and had been so employed for two years. He testified that on each of the three occasions described by Henry, he was parked with Inspector Patch near Henry's car, and that they could see Henry's car at all times. At the afternoon meeting, they were parked on the street about 25 or 30 yards away, and

on the other two occasions they were parked in a vacant lot about 40 yards away. Manson identified the defendant as the person who approached the car on all three occasions, and said that he and Henry had "mutually" identified the defendant walking down the street on the morning after the third meeting.

On cross-examination, Manson stated that he had maintained "surveillance" from the inside of his parked vehicle, and "I saw a motion of hands. I can't say it was money or whatever it was, I couldn't see that closely. I saw people in conversation and I saw a movement of hands. . . . I couldn't physically see what it was that was transferred." He saw defendant "from thirty feet, on one occasion, thirty yards on one occasion, and forty yards on two occasions."

Neither the informer nor Inspector Patch testified, although Manson identified a man in the court room as "Samuel Patch," his "fellow officer on surveillance that night." No narcotics and none of the marked money were found in a search of the defendant and his apartment. A stipulation was entered into "that the material contained in the People's Exhibit was in fact a narcotic drug commonly known as heroin."

Defendant Mason testified that he was 40 years of age and lived and worked in the Pershing Hotel at the corner of 39th and Ellis, and that he was arrested by Inspectors Manson and Patch on Ellis Avenue in the middle of the 3800 block. "They jumped out of the car and approached me with their pistols." He was going north on Ellis and was headed for a bar at 36th and Ellis to get a drink. He denied that he ever sold narcotics or that he was involved in any of the transactions described by Henry and Manson. He had never seen either of them before he was placed under arrest. He testified that he had never been arrested, had no record and never had anything to do with narcotics.

215

Initially, we consider defendant's contention that he "was unduly restricted in his right of cross-examination," and "that the widest latitude should be allowed the defendant in cross-examination for the purpose of establishing bias." He further asserts that the cross-examination of the State's witness Henry "was unduly restricted in that it prevented the defendant from impeaching the witness, discrediting his testimony and pointing out the contradictions existing between his testimony and that of his partner."

In defendant's previous trial, the trial court had sustained objections to questions directed to Henry and Patch to show that they had both been suspended by the State Narcotics Bureau. In reversing defendant's conviction, the Supreme Court (People v. Mason, 28 Ill2d 396, 403, 192 NE2d 835) said:

> "The scope of cross-examination is generally within the trial court's discretion. However, the widest latitude should generally be allowed the defendant in cross-examination for the purpose of establishing bias. (People v. Naujokas, 25 Ill2d 32.) In the present case the trial court cut off all inquiry on subjects with respect to which the defense was entitled to a reasonable cross-examination. This was an abuse of discretion and prejudicial error."

While defendant has not pointed out any specific instance to show that he was unduly restricted in the cross-examination of Inspectors Henry or Manson, we have carefully examined the cross-examination of both of these witnesses in the light of the above pronouncements. In the cross-examination of Henry, wide latitude was allowed as to his reason for leaving the Narcotics Division and as to the details of the narcotics sales. The cross-examination of Manson shows the same latitude.

216

■ At one point, the trial court refused to permit the court reporter, at defendant's request, to look over the previous testimony of Inspector Henry to find an allegedly inconsistent statement. At another point, the court refused to let the witness Manson draw a diagram of his position in relation to Henry's car, and also later sustained an objection to the remarks of counsel and a repetitious question. We conclude the instant record does not demonstrate that the defendant was unduly restricted in his right of cross-examination.

■ Defendant also contends that the remarks of the State's Attorney to the jury were prejudicial. The record shows that the State's Attorney told the jury that sales of narcotics are "considered in the eyes of the law, . . . after a murder, probably one of the worst, one of the most dastardly crimes to be committed." He also told the jury that "people who sell narcotics . . . what they are selling to the poor soul who buys it is a package of living death." In People v. Lopez, 10 Ill2d 237, 139 NE2d 724 (1957), the State's Attorney in his closing argument condemned the defendant as a "vicious, contemptible man . . . a destroyer of lives. . . . You see a man who destroys, who tears apart, who tears the living soul out of human beings." There, the Supreme Court said (p 240):

"But we must be mindful of the considerable latitude permitted in closing argument. For example, there was evidence that the defendant sold a narcotic drug in violation of law, and it is common knowledge that the illegal drug traffic is a serious menace to society. It was proper to argue on the evil results of such a crime and urge fearless administration of the law. . . . Moreover, reversal is not warranted unless it appears that the acts complained of influenced the jury in a manner that resulted in substantial prejudice to

217

the accused. . . . Here the jury returned a just verdict; indeed, it was the only reasonable conclusion to reach upon the basis of the evidence adduced."

The remarks complained of in the instant appeal come within the above pronouncements. There is no prejudicial error here.

■ Defendant further complains of the prejudice of the trial court and asserts this is demonstrated "by the commendatory remarks of the trial court to the jury, upon the return of its guilty verdict, his comments to the defendant, and . . . the refusal of the Court to give the defendant's instructions 2 and 3." We have examined the remarks of the court, all of which were made after the return of a guilty verdict, and we find no error there.

■ The instructions refused were so-called "cautionary" instructions having to do with the testimony and credibility of witnesses and in an area amply covered by the given instructions. The instructions given to the jury were adequate.

Defendant further argues, "The fact that the jury returned its verdict after fifteen minutes from its departure from the court room is persuasive that there was no opportunity for them to do other than elect their foreman and literally put a rubber stamp of guilty upon this defendant, ignoring the lack of sufficient identification and discrepancy in the identification and description of the defendant by Henry and Manson, the only two State witnesses, and that they could not possibly have read the instructions of the Court in that short time. Any verdict which is the result of prejudice such as here occurred, coupled with the prejudice of the State's Attorney and trial judge, requires a reversal."

■■ Considering this record, we fail to find any justification for the claim that the verdict or its prompt return were the result of prejudice of either the court or the State's Attorney. The positive testimony of Henry was corroborated by Inspector Manson. If Henry were biased or prejudiced against defendant, the trial court allowed a reasonable cross-examination to show it in order that the jury could consider it. It is true that neither the informer nor Patch testified. The State was not required to call the informer as a witness (People v. Mason, 28 Ill2d 396, 399, 192 NE2d 835), and Patch was in the courtroom, apparently available for use by either the court or the defendant and for whatever significance the jury might place upon the failure of the State to call Patch on its behalf.

■ We agree with defendant's final contention that the pronouncements of the Supreme Court upon the first appeal (People v. Mason, 28 Ill2d 396, 192 NE2d 835) were binding upon the trial court. The record shows the trial court did follow the opinion of the Supreme Court during the second trial, and that defendant received a fair and impartial trial, free from prejudicial error, and that defendant was accorded wide latitude in the cross-examination of the State's witnesses.

For the reasons given, the judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Affirmed.

BURMAN, P. J. and KLUCZYNSKI, J., concur.