People of the State of Illinois, Appellee, v. Kenneth D. Winstead, Appellant.

Gen. No. 51,896.

First District, Fourth Division.

December 15, 1967.

J. Roger Sewell, of Melrose Park, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant was convicted by a jury of the involuntary manslaughter [1] of his three-year-old stepdaughter, Linda Hernandez, and sentenced to a term of not less than nine years nor more than ten years in the Illinois State Pen-

---

[1] Involuntary Manslaughter is defined in section 9-3 of the Criminal Code (Ill Rev Stats 1963, c 38, § 9-3):

(a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly.

itentiary. He appealed to the Supreme Court on four grounds:

1. The crime was not proved beyond a reasonable doubt.
2. The trial court improperly limited defendant's cross-examination of the People's witnesses and did not maintain sufficient control of the trial to insure a fair trial.
3. The court made prejudicial remarks and did not maintain an impartial attitude.
4. The State's Attorney made improper arguments to the jury.

Finding no substantial constitutional question, the Supreme Court transferred consideration of these contentions to this court.

### Evidence

At the trial, there was unrebutted medical evidence that Linda Hernandez died of severe brain damage. There was evidence that Linda had four distinct injuries in the scalp area alone, a massive bruise on her forehead, bruises on each cheek and a large bruise on the chin and neck. Linda sustained numerous injuries to all parts of her body. One doctor testified:

> ". . . So the head revealed over the forehead and upper facial aspect multiple contusions or bruises, the largest of these was at the midline extending from about the base of the nose and into the hairline of the child. There were two others in the cheek area over the cheekbone, as we call it here and one rather extensive one on the lower jawbone extending almost to the neck. Then the upper extremities revealed, as well as the lower, many bruises or contusions. That is the arms, the forearms, the thighs, and the lower legs. These were distinctive on both anterior surfaces. Some were on the anterior surface, lateral,

170

medial, and inner surface. There was also on the lower back a very extensive bruise or contusion. This involved the mid part of the lower back extending over both buttocks, but more particularly on the right side in through the inner aspect of the upper thighs and up into the groin area. In addition, some of these bruises also showed what we call an abrasion, that is superficial loss of skin. Some of these were almost like blotches or patches over the buttocks, and over the back, lower back, there were several long, linear laceration-like type of abrasions. That is linear loss of skin. Over the back of the right lower leg there was one of these still crusted or dried blood that coagulated or dried on the laceration."

There was unrebutted medical testimony that all of these injuries occurred no more than three or four days prior to Linda's death on December 19.

Jennie Szymanski, a neighbor, testified that on December 11, 1963, while in the basement, directly below the Winstead apartment, she heard a loud slapping sound. She investigated through a hole in the door separating the Winstead apartment from a vacant store in the front of the building. The hole was three feet off the ground and an inch wide and through it she saw Linda Hernandez come "flying" out of the bathroom. She then heard defendant's wife Theresa shout, "Don't throw her like that. You will pull her sock [sic] out of her arm." On December 18, while in her apartment directly above the Winsteads', Mrs. Szymanski heard a loud banging and the sound of Linda crying. Upon investigation she saw Linda lying on the living room floor and defendant standing over her kicking her about the face and body. She went back to her apartment to call the police and then returned to view defendant administering a few more kicks. On December 19 Mrs. Szymanski heard Linda

171

crying and three or four loud banging sounds against the floor and wall, then the sound of something being thrown to the floor and the crying stopped. Defendant's wife Theresa shouted, "What did you do to her?"

Mary Lou Fentress testified that on December 19 at 7:30 a. m. Theresa came to her apartment shouting, "Mother! Mother! Linda is dying"; that she took the child to her apartment; that her nephew called the police who took Linda to the hospital where she subsequently died. Mrs. Fentress stated that she had often been a baby-sitter for Linda; that while baby-sitting on November 16 defendant had beaten the child with his hand; that only Mrs. Fentress' resistance had prevented his using a belt; that she had seen defendant beat Linda with a belt in October; that on December 10 she noticed that Linda was severely beaten from the waist down.

At the hospital the police questioned defendant and his wife as to how Linda incurred her injuries. They both stated that the injuries were the result of a fall from bed. When Officer Hoffheimer pointed out that such extensive injuries could not result from such a fall defendant admitted having beaten Linda with a belt the night before.

At the trial defendant and his wife testified that some of Linda's injuries were sustained when she fell out of bed and that the large lump on the forehead was sustained when she ran into a radiator. They further testified that Linda was a very clumsy child and that other injuries were sustained during her frequent fallings and bumping into things.

Upon cross-examination defendant's wife testified that Linda fell from her own bed on the morning of the 19th while defendant testified that the fall occurred while Linda was sleeping with him and his wife on a prior morning.

Defendant's wife testified as follows:

172

"A. I said she—I said I heard a noise in the room, she might have fallen off and she could have gotten up again and without letting me know because I heard a noise in the bedroom.

"Q. But when you came in the room Linda was in convulsions on the bed?

"A. Yes.

"Q. You never saw Linda fall off a bed, is that correct?

"A. No, I just heard the noise in the room.

"Q. Did you run in immediately when you heard the noise?

"A. No.

"Q. So it wasn't a very loud noise that you heard, is that correct?

"A. It was loud enough.

"Q. But you didn't run into the room?

"A. I figured she had picked herself up."

Defendant's own cross-examination was as follows:

"Q. I am talking about the 17th, 18th and 19th. In the course of caring for the child did Linda Hernandez fall out of bed?

"A. Yes, she did.

"Q. How many times?

"A. Once that I know of.

"Q. What day was that?

"A. Wednesday, [the 18th of December] I believe.

"Q. What time of the day?

"A. In the morning.

"Q. Where was she, in your bed?

"A. Yes.

"Q. Where were you when you heard the thump?

"A. The same bed.

"Q. You were in bed too?

"A. Yes.

"Q. What time of the day was this?

"A. Oh, around nine.

"Q. Did she fall on her head, her buttocks, her ankles, her finger tips, where?

"A. I don't know, I didn't see her fall, I was sleeping.

"Q. How did you know she fell out of bed?

"A. You can hear.

"Q. But you didn't hear anything on the morning of the 19th when your wife said she heard a thump?

"A. No.

"MR. HEALY: That is all."

At the trial defendant's wife testified that the large bump on the girl's forehead was received when she ran into a radiator on the afternoon of December 16th. Defendant testified that his wife told him about this accident when he got home from work that day but that they both thought the child was all right. Two doctors testified that it was improbable that the lump on the forehead came from contact with a radiator because there were no lineal lacerations or bruises. The officer who interrogated defendant and his wife at the hospital stated that neither had mentioned Linda's running into a radiator.

Defendant and his wife both testified that he never threw Linda against a wall, beat her with his hand or kicked her although he admitted hitting her with the leather part of his belt.

### Opinion

 Defendant first contends that his guilt was not proved beyond a reasonable doubt because the conviction was based on circumstantial evidence which could be explained upon a reasonable hypothesis consistent with

innocence. In People v. Huff, 29 Ill2d 315, 194 NE2d 230, where a similar contention was raised, the court said at page 320:

> "The fact that the circumstantial evidence relied upon must not give rise to any reasonable hypotheses under which the defendant could be innocent of the crime charged, [citation omitted] does not mean that the trier of fact is "required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt.""

In that case the defendant was convicted of the murder of a two-year-old child, a daughter of the woman with whom he lived. Some of the neighbors testified that they had heard sounds like a belt striking flesh and then a baby crying on numerous occasions. Defendant himself admitted to the police that he had beaten the girl with a belt and with an elastic strap on several occasions but at the trial he would only admit to using the elastic strap. The child had numerous bruises all over her body including her head and especially her back and buttocks. There was medical testimony that she died of brain damage. There was no direct evidence of the actual act which caused the child's death. The court said at page 320:

> "A conviction may be based upon circumstantial evidence, and this court has held that the manner of death and the means by which it was inflicted may be inferred from the circumstances proved. People v. Bartell, 386 Ill 483."

In the instant case the jury evidently disbelieved the testimony of the defendant and his wife that the fatal brain damage was caused by Linda's falling from bed or running against a radiator or some other unexplained occurrence. The State's evidence told of the shocking physical abuse of a three-year-old child by defendant; it

175

showed numerous, massive injuries to her and the extensive brain damage which caused death. The circumstantial evidence in this record justified the jury in believing that Linda was mortally injured by defendant and its verdict so grounded must be sustained. See People v. Sapp, 282 Ill 51, 118 NE 416.

■ ■ Second, defendant contends that the court improperly limited the cross-examination of the State's witnesses in some instances and lost control of the proceedings to defendant's prejudice in other instances. On cross-examination defendant should be allowed ". . . reasonable latitude . . . to test the means of observation and the accuracy of the memory . . ." of the witness (People v. Del Prete, 364 Ill 376, 380, 4 NE2d 484) and to question ". . . as to whatever goes to explain, modify or discredit what he has stated in his first examination." (Chicago City Ry. Co. v. Creech, 207 Ill 400, 403, 69 NE 919.) Cross-examination, however, is necessarily within the discretion of the trial judge and it is only for a clear abuse of that discretion, when judged by the standards of Del Prete and Creech, that a case will be reversed. People v. Provo, 409 Ill 63, 97 NE2d 802; People v. McCain, 29 Ill2d 132, 193 NE2d 784.

Defendant complains that he was not allowed to ask Mrs. Szymanski whether she knew that defendant had been shot or that he had sprained his ankle prior to the time she testified she saw him kicking Linda. Whether or not the witness knew of these occurrences has nothing to do with her ability to perceive, the accuracy of her memory or her veracity. Although direct evidence as to these facts bears on the likelihood of defendant's kicking Linda as testified, it was more properly a part of defendant's own case and was later introduced in defendant's evidence. There was no abuse of discretion in thus limiting the cross-examination.

In response to Mrs. Szymanski's testimony that she observed defendant kicking Linda through a crack in the

door, defendant unsuccessfully sought to ask, "You had tenants in the building yet you allowed a crack to stay in the door when they were renting from you?" There was no error in sustaining the objection to this question since defendant sought to show that only a part of the living room was visible through the crack and did not dispute its existence.

Defendant argues that he should have been permitted to ask Mrs. Szymanski why she failed to notify Linda's mother of the brutality she testified to. In view of Mrs. Szymanski's testimony that Theresa had on two occasions shouted at defendant about his treatment of Linda, the purpose of this question could only be to harass the witness. Its exclusion was not error.

Finally, defendant suggests that he should have been permitted to ask Mrs. Szymanski what the police did when they came to defendant's apartment in response to her call on December 18. The record shows that Mrs. Szymanski testified that when the police arrived she heard part of the conversation between the police officers and defendant and then returned to her apartment. She was asked whether the police arrested defendant and the objection was sustained on the ground that she had testified that she left the area of defendant's apartment and consequently did not know what happened. We find no prejudicial error in this ruling.

In addition to the excessive limitation of his cross-examination, defendant suggests that the court did not sufficiently limit some of the witnesses. He argues that the court did not maintain adequate control of the trial.

Defendant complains that on three occasions Mrs. Fentress was allowed to ramble and give unresponsive answers to his cross-examination over his objection. The following testimony is complained of:

> "Q. On the 16th of November when you said Kenneth Winstead came home from the hospital and Linda was ill you said her fever was 103°?

177

"A. That's right.

"Q. You had been watching Linda while Mrs. Winstead worked and Mr. Winstead was at the hospital, hadn't you?

"A. Yes, but she wasn't sick. When she seen him she run a fever and shake like everything and run from him and scream. She don't want anything to do with him.

"MR. HOWARD: I ask the Court to instruct the witness to only answer the question put to her and not add any other statements.

"THE COURT: Well, I think she was answering your question, Counsel.

"Q. What other occasion did she run a temperature of 103°?

"A. Any other occasion he was around and beat her."

Although Mrs. Fentress' first statement about the circumstances of Linda's illness was not responsive to the immediately prior question, it was responsive to the general line of questioning. The cross-examiner had implied that the witness attributed the fever to an illness and the witness had a right to explain that.

The second occasion complained of was the following:

"Q. She also—you—when you talked to the police about this before you stated Mrs. Winstead said that Linda had fallen out of bed on the morning of December 19th, didn't you?

"A. She told me from the hospital that Linda had fell out of bed. That was the story she gave at the hospital.

"MR. HOWARD: Objection.

"MR. KATZ: Let her answer.

178

"THE COURT: Overruled.

"MR. HOWARD: The witness is stating a conclusion when she said it was a story.

"THE COURT: Just a minute.

"MR. KATZ: Let her finish her answer."

The witness then related the following:

"She [defendant's wife] called me from the hospital and she told me that Linda had been admitted to the hospital, and she said, 'I told them that she had fell out of bed.' I said, 'Theresa, you are not going to get by with that. You know what have happened to that baby.' And she said, 'Well, I am pregnant, expecting another baby, what can I do? I don't know what to say.'"

No objection or motion to strike was made to this testimony and we perceive no error.

Thirdly, defendant complains that when Mrs. Fentress was cross-examined about her testimony that she observed defendant holding a spoon in Linda's mouth, the following objectionable testimony was given:

"Q. Do you know why he had a spoon in her mouth?

"A. No, I don't. Maybe he was going to finish killing her.

"MR. HOWARD: Object to that.

"THE COURT: The Jury will disregard that remark."

 As was said of a similar situation in People v. Naujokas, 25 Ill2d 32, 182 NE2d 700, at page 36:

". . . In view of the fact of the court's prompt action and the fact that the testimony was not adduced

179

by action of the State, we feel that the court was not in error in denying the motion for a mistrial."

This testimony does not require reversal.

██ Defendant further argues that the court erred in allowing Officer Hoffheimer to testify that the other officer at the police station told him that defendant had never mentioned Linda's running into a radiator but had stuck to the story, which was told him, of her falling out of bed. The overruling of defendant's objection was error since this testimony was hearsay. However, in the case of People v. Davis, 10 Ill2d 430, 140 NE2d 675, at page 444, the court said:

> "It is not the purpose of a court of review to determine whether or not a record is free from error, but rather to determine whether or not the accused has had a fair trial under the law and whether his conviction is based upon evidence establishing his guilt beyond a reasonable doubt." People v. Stavrakas, 335 Ill 570, 583, 167 NE 852.

We cannot conclude that this testimony precluded defendant from having a fair trial or that it affected the trial's result.

Finally, objection is made to other testimony elicited in cross-examination but not objected to at the trial. The general rule is that failure to object at trial will bar review. People v. Burage, 23 Ill2d 280, 178 NE2d 389. Exception will be made where there could not otherwise be a fair trial or where denial of review would lead to a deterioration of the judicial process (People v. Sprinkle, 27 Ill2d 398, 189 NE2d 295). But this is not such a case. These objections cannot be reviewed by this court.

██ Third, defendant contends that the trial judge made comments prejudicial to him at the trial. He argues that it was prejudicial error for the judge to caution defense counsel within the jury's hearing about asking

180

improper questions on cross-examination which might tend to prejudice the jury. The defense attempted to weaken the testimony of Mrs. Szymanski and another prosecution witness by insinuating irrelevant wrongdoing on their part. We believe the following language from People v. Shockey, 66 Ill App2d 245, 249, 213 NE2d 107, is pertinent:

> ". . . In almost every case it is possible to take some remark [of the trial judge] out of context and out of the heat of a trial and find possible prejudice. It is one thing to consider these isolated remarks in the tranquil atmosphere of an appellate tribunal and quite another thing to consider them in the whole context of an actual trial. It is apparent from a reading of the entire record that the remarks were a result of severe provocation on the part of the defendant's counsel."

See also People v. Jones, 29 Ill2d 306, 194 NE2d 239.

■ Defendant also complains of the judge's commending the jury on their verdict and telling them they could have been sterner and found guilt of a more serious crime. The judge is under no obligation not to have a view of the case and such commendatory remarks after the verdict are not error. People v. Mason, 63 Ill App2d 211, 211 NE2d 494. Defendant's complaint about the judge's characterization of him at the hearing on aggravation and mitigation is equally futile. At such a hearing the judge has a duty to determine whether or not the defendant is entitled to lenience and his articulation of his reasons for a stern sentence cannot be error. Defendant, however, claims that these statements reflect the judge's prejudice and were manifestations of the biased manner in which he conducted the trial. Since he is unable to demonstrate improper judicial action at the trial, his argument must fail.

Fourth, it is contended that the State's Attorney made prejudicial statements during the closing arguments. Defendant maintains that references to the defendant's lying about the cause of Linda's death and references to his throwing her against the wall were improper because they were based on the prosecutor's personal belief rather than the evidence. There was evidence that defendant changed his story of the cause of Linda's death. Further, the convincing showing of physical brutality could give a jury basis for doubting that the fatal injury was caused by an accident as defendant testified. It was proper to argue that defendant was not telling the truth. People v. Weaver, 18 Ill2d 108, 163 NE2d 483. It was also proper to argue that defendant threw Linda against the wall. Mrs. Szymanski testified that she heard the sound of something being thrown against a wall and then Linda's crying. "We are of the opinion that this argument was a legitimate inference and conclusion from the evidence and as such was admissible." People v. Hayes, 23 Ill2d 527, 531, 179 NE2d 660.

Cases cited by defendant are distinguishable. In People v. Black, 317 Ill 603, 148 NE 281, the prosecutor told the jury twice that he would not seek a conviction if he and his associates were not absolutely sure of the defendant's guilt. In Appel v. Chicago City Ry. Co., 259 Ill 561, 102 NE 1021, counsel said that based on his canvass of the area of the accident, he was sure that what his proffered witnesses had said was true. In both cases counsel explicitly rested arguments on personal beliefs based on experience outside of the trial. The prosecutor in the instant case argued only what was based on the evidence presented. Defendant also cites People v. Dukes, 12 Ill2d 334, 146 NE2d 14. In that case the prosecutor injected into closing argument insinuations about a prior record which he based upon an alias appearing in the indictment. We have no such situation before us.

██ Defendant also complains about the prosecutor's remark that defendant's wife may very well have been lying because wives often lie for their husbands. This was clearly an answer to defendant's closing argument that a child's mother wouldn't lie to protect a killer. It is not error to point out possible sources of a witness' bias. Furthermore, the State's Attorney is entitled to answer defendant's argument. People v. Hayes, 23 Ill2d 527, 179 NE2d 660.

██ Defendant asks us to review other parts of the closing argument which he now cites as error but which he failed to object to at the trial. Review of closing arguments which have not been objected to can be had only where the parties could not otherwise receive a fair trial or review is necessary to prevent deterioration of the judicial process. People v. Sprinkle, 27 Ill2d 398, 189 NE2d 295. Review can also be had where the accused would otherwise be deprived of a constitutional right. People v. Weinstein, 35 Ill2d 467, 220 NE2d 432. The instant case, however, falls not under these exceptions but under the general rule that failure to object to closing arguments bars their review. People v. Wilson, 342 Ill 358, 174 NE 398.

We find that the verdict was supported by the evidence and that the trial was free of prejudicial error.

Affirmed.

ENGLISH, P. J. and McCORMICK, J., concur.