**People of the State of Illinois, Plaintiff-Appellee, v. Lewis Ray Tucker, Defendant-Appellant.**

Gen. No. 52,394.

First District, Fourth Division.

February 14, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James J. Doherty, Assistant Public Defender, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Edward Stasukaitis, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

OFFENSE CHARGED: Murder.

JUDGMENT: After waiving his right to a jury trial the defendant was convicted of the lesser included offense of involuntary manslaughter and sentenced to serve a term of not less than nine nor more than ten years in the State penitentiary.*

CONTENTIONS ON APPEAL:

1) The defendant was not proved guilty beyond reasonable doubt;

---

* Ill Rev Stats 1965, c 38, § 9–3. Involuntary Manslaughter and Reckless Homicide.] (a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly.

2) The trial court erred in admitting into evidence Exhibit No. 1, the Post Mortem Examination Report of the Coroner (Protocol).

EVIDENCE. Testimony of State's Witnesses.

The State called as its first witness Bonnie Byres, the mother of the deceased. She testified that she had known the defendant for approximately two years, and that she and her two children—Carrie, age two, and Steven (the deceased), age three and one-half—had been living with the defendant since June of 1966. She testified that on November 28, 1966, the defendant had spanked her son; that she had not seen the act, but had heard the child cry out. She stated that the defendant had spanked the child on other occasions but had never hurt him and generally treated him well. She testified that the last time she saw her son alive was at about 5:30 p. m. on the 28th of November; that his face was bruised, particularly one eye, and his forehead. She contradicted this statement in her later testimony in that she subsequently testified that upon examining her son at the morgue on November 29, she found that his eye and forehead were bruised, but that she didn't believe those marks were there when she left home. However, on cross-examination she clarified her position and stated:

> "When I last saw Steven about 5:30 p. m., November 28th, he had a bruise on his forehead, and I believe his eye was a little bruised. I don't know, it just didn't appear to me, after I had seen him, that it was that bad. But I suppose maybe it was."

She did not testify that she saw any of the bruises on the rest of the child's body.

On cross-examination by the attorney for defendant, Miss Byres testified that on November 25, 1966, her son Steven had been playing under a bed which she described as "quite heavy," and in tampering with it caused it to collapse on his stomach. However, at no time during

64

her direct testimony did she mention the incident. She stated that after the falling of the bed she observed that the deceased "didn't care too much for food" and ate very little. When questioned specifically by the court she stated that in the interim between the incident and her son's death all that he would eat was half a piece of toast, some beans and some water. She also noticed that he was unable to walk properly and started limping; that in fact, that evening when they were moving into a new apartment she had to carry the child as he was unable to keep up. It is worthy of note that at no time immediately after the child's death did either the witness or the defendant mention to the police or anyone else the incident of the falling bed, despite the fact that they were both questioned by the police as to the physical condition of the deceased. In fact, Miss Byres testified that it was not until she was actually on her way to the Grand Jury that she first mentioned the incident to Officer Kelly.

James C. Kelly, a police officer assigned to the Homicide Division of the Chicago Police Department, was instructed to conduct an investigation to ascertain the exact cause of death of the deceased, whom he observed in the Emergency Room of the American Hospital at 8:45 a. m., on November 29, 1966, approximately 15 minutes after he had been pronounced dead. He testified that he noticed numerous bruises covering approximately 80 percent of the deceased's body; in all, he counted 78 bruises of varying sizes and coloration. During cross-examination he described the condition of the body as follows:

> The right eye had slight discoloration around the front and the bruise was approximately an inch in diameter. This bruise was above the right eye on the eyelid. There was a slight laceration. The coloration of the bruises over the eye was a brownish red. There was a discoloration of what appeared to be a

bruise around the left eye also. There was no laceration there. The bruise was approximately the same size—about an inch in diameter. Both of these bruises were above and on the outside of the eye towards the temple area. I believe there was a slight bruise on the bridge of the nose also. I can't recall whether there was any laceration there. The bruise on the nose was very small, approximately, I'd say at most, a quarter inch.

I stood over the body and counted the bruises for approximately ten minutes. There were four or five bruises in the abdominal region. There were two that appeared to be right in the center of the more pronounced bruises. There were other bruises off on the side. But there were no lacerations. The major bruise would possibly be about two inches. The major bruise was the darkest in color. There were two major bruises but the more predominant one appeared to be about two inches in diameter. The other major bruise was slightly smaller, possibly an inch, an inch and a half. The other bruises, I'd say, were about the size of a quarter. The major bruises were off to the right side. There were numerous bruises on the legs and thighs. They were all approximately of the—the coin variety. You would say, dimes to quarters to pennies. They were all in that category. Some were dark, others were very dark—various shades of bruises.

Q. Pardon me. I don't think I asked you before. What was the coloration of the bruises on the abdomen?

A. They were very light; of a reddish nature; light brownish red.

Q. Was there any blue?

A. No blue.

Mr. Weber: Well, what color was predominant?

Mr. Garlovsky: Objection.

The Court: I'll let him answer.

The Witness: Brownish.

Mr. Weber: Q. I'm asking you now if you recall any bruises to the legs, the lower part of the anatomy, from the kneecap down to the ankle or foot and from the kneecap up on the front side of his anatomy?

A. There was numerous bruises, and it encompassed approximately eighty percent of his body, these bruises.

Q. Eighty percent of his body?

A. I would say, from the back to the front; and on his lower extremity, he had bruises, small bruises.

Q. Did he have any bruises on his back?

A. Yes, there was bruises on his back, small bruises.

Q. Whereabouts on the back?

A. Spread throughout his shoulder area.

The witness further testified that at about 10:00 a. m. he had conversations with both Miss Byres and the defendant concerning the death of the deceased. He stated that Miss Byres did not mention the incident concerning the collapse of the bed at that time, nor—contrary to her testimony—when he accompanied her to the Grand Jury. When he questioned the defendant about the bruised condition of the deceased he, too, did not mention the incident, but commented simply that he could not account for the bruises; that all he had done was to "spank the boy with his hand when the boy did not eat, and that was the extent."

Officer John Hennessey testified that at 8:00 a. m., on November 29, 1966, he received a call to assist a sick child. Arriving at the scene, he was met by the defendant carrying the deceased wrapped in a blanket. He told the defendant to get into the back of the squadrol with the child and proceeded immediately to the American Hospital; the child was pronounced dead upon their arrival.

67

Dr. Jerry Kearns, a licensed physician and surgeon, who had been employed as a Coroner's pathologist for 24 years, testified that he had examined People's Exhibit 1, the Coroner's Protocol of the postmortem examination of the deceased, which was stipulated to by the defense and received in evidence. He stated that he had not personally examined the deceased, but that according to the protocol the deceased had "multiple contusions, a total of fourteen in the skin, on the forehead on the right side, the upper lip on the right side, the face, on the left side, the chin, in the midline and over the jaw at the left of the midline. There were contusions in the skin of the neck above the clavical or collar bone. The right shoulder and right arm, the left arm and the left hand; the abdomen in the area that the appendix is ordinarily found, in the lower quadrant on the right side, both thighs and both legs. A total of fourteen different contusions all in the front, not in the back. In the abdomen was found 1280 cc of blood; this amounts to little over a quart. In my opinion, the cause of death of Steven Bollinger was a traumatic intra-abdominal hemorrhage, the result of a tear in the blood vessel which drains all the blood from the small and large vein, the mesenteric vein. The mesenteric vein drains blood from all of the small bowel, large bowel up to about the midline at the right side of the body. This is a major blood vessel. It is my opinion that this hemorrhage was caused by external violence applied to the abdomen. A human blow could have caused the rupture of this vein. As a human blow is not different from a blow from any source."

Dr. Kearns was of the opinion that the deceased died from an "explosive" hemorrhage in that the mesenteric vein was ruptured and all the bleeding occurred within a relatively short period rather than a few cc's at a time. He based his opinion upon the amount of free blood which was found in the abdominal cavity as opposed to

68

blood of varying consistency and color, and on the basis of the description of the contusions suffered by the deceased contained in the Coroner's report. When questioned specifically as to whether in his opinion a bed falling on the deceased on November 25 could have been the cause of death, Dr. Kearns replied, "I don't think so, I really don't think so. The interval; the interval from the 25th to the 29th is too long. It would take only an hour or hour and a half to die from this sort of injury, bleeding in the abdominal cavity. And four days, that's too long."

Testimony of Defense Witnesses.

Bonnie Byres was also called as a defense witness, but aside from her statement that at the time of his death her son's eyes were swollen and discolored due to a sinus infection, her testimony is substantially in accord with her previous testimony as a State's witness, which has already been described and need not be repeated.

Lewis Ray Tucker, the defendant, testified that on the evening of November 25, 1966, he noticed that the deceased was acting strangely in that he walked slowly, and that he "didn't seem to be moving around with no get up about him," and wasn't eating properly. He described the condition as remaining substantially unchanged for the next few days. At about 5:00 p. m., on November 28, Bonnie told him that Steven wouldn't eat and asked him to try and see if he could do something about it. The defendant said, "Steven, if you don't eat that, I'm going to whip you." The defendant stated that he then proceeded to strike the boy approximately four or five times on the buttocks with only the palm of his hand. He did state, however, that in the past he had used a paddle when spanking the boy. He testified that it was not until 4:00 a. m. the next day that he was awakened by the boy's crying; he went into the bedroom and found him bleeding from his mouth; when he checked

69

him half an hour later he found the boy had vomited and was "making gagging like noises" and he thought the boy had passed out. When he was unable to revive him the police were called and the child was taken to the hospital.

Dr. Lawrence Mann, a licensed physician, testified from the protocol that in his opinion, considering the type of massive abdominal hemorrhage which was sustained by the deceased, he might very well have died within four days after sustaining the injury. He concluded that a massive hemorrhage does not necessarily indicate a recent death, but rather depends upon whether all the blood was present in the abdominal cavity at one time or over a longer period of time. He noted that the Coroner's report showed the existence of some partially clotted blood in that area which would indicate that the bleeding had occurred over a period of time.

OPINION.

We will first consider the contention of the defendant in this appeal that he was not proved guilty beyond a reasonable doubt.

The defendant testified that he was "an able bodied seaman"; that on November 28 he struck the child four or five times on the buttocks with the palm of his hands; that after Miss Byres left he put the children to bed; that about 4:00 a. m., on November 29, he heard the deceased making crying sounds; that he went into the bedroom and found the child lying on the floor, bleeding from his mouth, and that he put him back into bed. Half an hour later he found that the boy had vomited and he sent him to the bathroom. He sent him there a second time when he again appeared ill, and he testified as follows:

"So I said, 'Steven, if you are still sick go in the bathroom.' So he went back in. Then I went in behind him and he was standing there trying to vomit. He was standing over the commode and holding both

sides of the commode with his hand. Then all at once his legs just seemed to start going out from under him."

The defendant tried to give him some water, but he refused it, and "choking" noises continued to come from his throat. The defendant said, "So he still didn't seem to be coming out of it, so then I thought there's something wrong with him." After that the defendant asked the landlady to call the police and the child was taken to the hospital. It is worthy of note that the defendant made no effort to hold up this three-year old child who was clutching the commode and vomiting.

 The entire conduct of the defendant during this time was fully presented to the trier of the fact for his consideration. The credibility of the defendant was a matter to be determined by the trier of the fact who had a right to consider his evidence with regard to the care the defendant took of the deceased when he was ill, as well as his statement that after all this had been going on for a considerable period of time he came to the conclusion that something was wrong with the child.

A case bearing considerable similarity to the one before us is People v. Winstead, 90 Ill App2d 167, 234 NE2d 175, in which the defendant was convicted by a jury of the involuntary manslaughter of his 3-year-old stepdaughter. There the defendant argued in part, that the crime was not proved beyond a reasonable doubt. There was evidence that the child died of severe brain damage; that she had four distinct injuries in the scalp area alone, and numerous injuries to all parts of her body. A neighbor testified that she heard a banging in the apartment and heard the protest made by defendant's wife telling him "not to throw her about"; that she heard crying and banging against the floor and the wall. At the hospital the police questioned the defendant and his wife as to how the child had received the bruises. They

said the child fell out of bed, and at the trial they testified that the lump on the child's forehead was sustained when she ran into a radiator. The interrogating officer testified that defendant never mentioned the radiator to him. Defendant then admitted beating the child with a belt.

In Winstead the defendant contended that his guilt was not proved beyond a reasonable doubt because the conviction was based upon circumstantial evidence which could be explained upon a reasonable hypothesis consistent with innocence. The court cited and quoted from People v. Huff, 29 Ill2d 315, 194 NE2d 230, where the court said at page 320:

> "The fact that the circumstantial evidence relied upon must not give rise to any reasonable hypotheses under which the defendant could be innocent of the crime charged [citation omitted], does not mean that the trier of fact is 'required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt.' (People v. Russell, 17 Ill2d 328, 331.)"

The court in Winstead affirmed the judgment and sentence of the trial court, saying at page 176:

> "The circumstantial evidence in this record justified the jury in believing that Linda was mortally injured by defendant and its verdict so grounded must be sustained. See People v. Sapp, 282 Ill 51, 118 NE 416."

 In the instant case the evidence would entitle the trier of the fact to believe that there was a constant and long series of abuse and ill treatment of the child which resulted in his death. Under those circumstances the defendant was properly convicted of involuntary manslaughter.

The defendant also contends that the court erred in permitting the protocol made out by Dr. Henry to be admitted in evidence and in permitting Dr. Kearns to testify from that record. He argues that medical records containing the conclusions of doctors and nurses cannot be admitted into evidence as a record made in the ordinary course of business, citing Wright v. Upson, 303 Ill 120, 144, 135 NE 209; Howard v. Illinois Trust & Savings Bank, 189 Ill 568, 574, 59 NE 1106. The State admitted that Dr. Kearns had not made an examination of the deceased, but that his testimony was based upon Dr. Henry's report. Defendant cites Supreme Court Rule 236 (Ill Rev Stats 1967, c 110A, § 236), which provides:

(a) Any writing or record, . . . shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, . . .

(b) This rule does not apply to the introduction into evidence of medical records. . . .

■■ However, in the case at bar, the State and the defendant stipulated to the pathologist's report. In the record it appears that the State's Attorney stated: "At this time, before I call Doctor Kearns, I would ask Counsel if he would stipulate to the protocol of Doctor Henry." After further discussion counsel for defendant said, "All right. I'll so stipulate." The stipulation as to the pathologist's report admitted its truthfulness, and there was no need for further evidence as to the correctness of the entries made. (See Wigmore on Evidence, 3rd Edition, § 2588, page 586.) Also, the defendant called as his witness Dr. Mann, and presented to him the protocol. The doctor's testimony was based, as he stated, upon his examination of the Coroner's report. The court committed no error in permitting the protocol to be introduced, nor in permitting Dr. Kearns to testify in reliance upon it.

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER, P. J. and ENGLISH, J., concur.