THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NORMAN L. PLATTER, Defendant-Appellant.

Second District    No. 79-392

Opinion filed October 22, 1980.

Donald C. Dowling, of Dowling & Safanda, of St. Charles, for appellant.

Gene Armentrout, State's Attorney, of Geneva (Phyllis J. Perko and Barbara Preiner, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Norman L. Platter, was charged by indictment with the offense of involuntary manslaughter (Ill. Rev. Stat. 1977, ch. 38, par. 9—3). The indictment alleged that on February 2, 1979, defendant recklessly performed an act likely to cause death or great bodily harm, in that

he struck Kristie Hubbard in the stomach, causing the rupture of her duodenum and her subsequent death. The victim was the three-year-old daughter of his fiancee, Kathy Hubbard, who was living with defendant in his parents' home at the time. Defendant admitted striking the victim, but contended that the child sustained the injuries resulting in her death on February 1, 1979, when she accidentally collided with a heavy wooden coffee table at a friend's home. The jury found defendant guilty of the charged offense, and the trial court entered judgment on the verdict. Defendant was sentenced to serve a term of three years' imprisonment, and he appeals. The following issues are presented for review: (1) whether defendant was proved guilty of involuntary manslaughter beyond a reasonable doubt; (2) whether the trial court erred in admitting opinion testimony by an expert witness that the victim was suffering from "battered child syndrome"; (3) whether the trial court erred in refusing to give defendant's tendered instruction on the doctrine of *in loco parentis*; (4) whether the trial court properly admitted into evidence testimony regarding defendant's prior acts of abuse toward the victim; (5) whether the trial court erred in denying defendant's motion to exclude the testimony of Michael Denz; (6) whether defendant was prejudiced by the State's reference in its opening statement to testimony which it was later precluded from presenting at trial; (7) whether the trial court erred in permitting the prosecutor to ask a defense witness if the defendant had a violent and uncontrollable temper; and (8) whether the prosecutor's closing argument was improper and prejudicial.

For the reasons hereinafter stated, we affirm.

## THE STATE'S CASE-IN-CHIEF

The prosecution presented the following evidence at trial. Doren Johnson, a paramedic with the Carpentersville Fire Department, testified that he and Deputy Chief Vandemeir, firefighter Steve Glumm, and fireman trainee Dan Zarcord responded to a call for an ambulance at 107 Pecos Circle, Carpentersville, at about 10:14 p.m., February 2, 1979. When they arrived at the residence, later identified to them as the Platter home, he noticed a child lying upon the floor in an apparently lifeless condition. Johnson and the other officers testified that, upon examination of the child, they found no vital life signs.

They immediately undertook life-saving techniques in the Platter home and continued them en route to Sherman Hospital in Elgin, where they arrived at 10:35 p.m. The paramedics administered cardiopulmonary resuscitation (CPR), which is cardiac massage plus mouth-to-mouth resuscitation, and also administered electrical heart defibrillation, in their efforts to revive the child.

Upon arrival at Sherman Hospital, the child was attended by two physicians, Dr. Charles Cavallo and Dr. Richard Nervis. Dr. Cavallo testified that the child was essentially dead on arrival. He and Dr. Nervis performed numerous emergency procedures in an effort to save the child's life, but there was never any real change in the child's clinical condition from the time she arrived in the emergency room. After about an hour of treatment, he pronounced her dead.

On cross-examination, Dr. Cavallo testified that he determined from an X ray taken during resuscitation that the child suffered a massive bowel perforation. According to Dr. Cavallo, the injury suffered by the child in this case was a "very unusual, very massive injury." In his opinion, duodenal injuries can manifest themselves several days after injury. However, a duodenal injury with a complete transection will not manifest itself several days later, but would become obvious fairly soon, within 12 hours. In his opinion, a child whose duodenum was severed, and held together by only a couple of strands of tissue, would be moribund in 12 to 16 hours, if the injury was a free perforation into the peritoneal cavity. If it was assumed that there was a small pre-existing tear in the duodenum, a "tremendous force" would nevertheless have been necessary to cause a total transection later.

Dr. Nervis, a pediatrician and lawyer, testified that he found numerous bruises on the child's body. In his opinion, these bruises were not accidentally caused and fell within the range of "Battered Child Syndrome."

The prosecution also presented the testimony of Dr. William Goodfellow, who had performed the autopsy on the child. Dr. Goodfellow stated the child's height as 36 inches and her weight as 20 pounds. Upon examining the external surface of the child's body, he noted numerous contusion features (bruises) on the following parts of her body: right lower quadrant of abdomen, periumbilical zone, left upper lateral abdominal zone, left hand, right elbow, two at left upper buttocks zone, four to five at lumbar area of the back, and multiple bruises at right upper temporal parietal zone.

Dr. Goodfellow also testified regarding his internal examination of the child. He stated that opening the abdominal cavity caused the release of free air, and revealed the presence of approximately 1½ liters of partly blood-stained greenish-brown fluid containing some particulate matter. This fluid was present in the peritoneal cavity as a result of the total transection of the child's duodenum.

Dr. Goodfellow described the duodenum, the first portion of the small bowel, as a quite "rigid muscular layerous zone"—essentially a tube composed of an inside wall with epithelial features, a muscular compo-

nent, and connective tissue features. In a child, the duodenum is approximately four inches long, located in the upper half of the abdomen, and is described as having four parts.

Dr. Goodfellow described the symptoms which would be exhibited by a child who was suffering from a transected duodenum. He stated that a blow to the front of the abdomen would press the duodenum against the lumbar vertebrae causing it to tear. Fluids which would ordinarily pass through the duodenum on their journey through the intestinal tract would flow instead into the abdominal cavity. The doctor described this as a "devastating insult" to the system, and a "very serious phenomenon."

This condition would not go without complaint from the child, and the distress would be noticeable to others. The child would exhibit nausea and vomiting, would complain of pain, and would exhibit a disinclination to move around. This would result eventually in prostration, a semicomatose state, shock, and death. After the initial injury and pain, the child might experience a quiescence of pain, not lasting more than one to two hours after the injury, and then would exhibit more symptomatology as the child's condition steadily declined.

Dr. Goodfellow further testified that in this child, the fluid had not been present in the peritoneal cavity for more than 14 hours as it could be determined by the extent of the peritonitis. If more than 24 hours had elapsed, a more prominent degree of peritonitis would be present, but here the peritonitis was focal and early.

The margins of the tear in the duodenum were characterized by mechanical distortion of some pre-existing injury, weakness, or disease. A microscopic study of the tissue from the margins of the tear showed the tear to be less than 14 hours old. The minimal number of white cells in the area indicated that it was a matter of hours from the initial injury until the child's death and that during that time she was entering into shock. The presence of some particulate matter in the fluid in the abdominal cavity was consistent with the child having consumed a minimal amount of food.

The internal examination also revealed to Dr. Goodfellow two tears in the mesentery, an organ which supplies blood to the bowel. The mesentery contains a large number of blood vessels and these tears were completely through the mesentery, not at the root, but in a more proximal part (in the area of the periumbilical zone) early in the course of the mesentery where the vascular channels are large. This, according to the doctor's testimony, would explain why the fluid in the abdominal cavity was significantly bloody. Dr. Goodfellow stated that the same blunt trauma that caused the transection of the child's duodenum caused these tears in the mesentery.

Dr. Goodfellow testified that a child who had incurred tears in the mesentery would experience pain, weakness, and lethargy. Eventually,

the child would only be comfortable lying down because of the effect of blood returning to the heart, and would eventually become semicomatose. This would occur because when the mesentery is torn, blood escapes rapidly causing, in Dr. Goodfellow's words, an "embarrassment" to the cardiovascular system. The combination of this injury with the transection of the duodenum would result in the child's demise in less than 14 hours.

Dr. Goodfellow also stated that this was more than a retro-peritoneal injury; it involved damage to the peritoneum in front of the injuries, and allowed the fluid to flow into the peritoneum. He concluded that these internal injuries were the result of a blunt trauma caused by a great mechanical force which came from a fairly direct front to back source, the area of the blow corresponding with the bruise found on the child's body in the periumbilical zone. The time elapsed between injury and death was stated to have been no more than 14 hours.

Officers Gary Ford, Salvator Macaluso, and Douglas Blank of the Carpentersville police department testified that on February 7, 1979, defendant voluntarily made a statement to police, which was admitted into evidence at trial. In this statement, defendant admitted striking the child in the stomach area with the back of his hand on February 1, 1979, the day of the child's death. He told police that he had told the child to pick up her toys, but she cried instead. He then tried to "crack her on the ass," believing that the child was about to walk away from him, but struck her in the area of her abdomen.

The State also introduced evidence to demonstrate that Norman Platter did or may have acted abusively toward the child on four other occasions. First, Michael Denz, 16-year-old next-door neighbor to the Platters, testified that in July 1978 he saw defendant come out of the Platter house, pick up the child by one arm off the front steps and spank her three times and tell her she was not to play on the stairs. The child cried. On direct examination, the witness demonstrated a blow of great force as that employed by defendant. On cross-examination, however, the witness admitted that when interviewed by defense counsel before trial, he had not shown him the heavier blow used in the courtroom and stated that he had misled defense counsel.

Coletta Regan, a neighbor across the street from Platters, testified that in July 1978, when defendant was washing the car in the Platter driveway, he called out to the child, who was running down the sidewalk. The witness testified that defendant followed the child, grabbed her by the arm, dragged her back to the driveway and slapped her across the face with "a lot of force." Mrs. Regan did not report the incident when it occurred.

Debra Holder, cousin of the child's mother, testified that on August 19, 1978, defendant, Kristie and Kristie's mother came to visit her. Kristie's

face was bruised and her mouth swollen. Holder inquired what happened, and, she testified, Norman stated he had struck the child for not eating properly.

Carol Insco, sister of Kristie's mother, testified that on August 4, 1978, defendant struck Kristie with force on the left side of the face, leaving a bruise. This testimony concluded the State's case-in-chief.

## DEFENDANT'S CASE-IN-CHIEF

Defense witnesses testified that on the day before the child's death (*i.e.*, on February 1, 1979), her mother took her for a doctor's appointment in Elgin. The mother and child were driven to the doctor's office by Philip Deitz, age 37, a resident of Elgin. Deitz testified that he picked up the child and her mother from the doctor visit about 11 a.m., and later took them to his residence in Elgin, arriving at about 12:45 p.m. Inside his home he, Kristie, and her mother remained in the living room. He said that the child began energetically running around, was told to sit down several times and then started running around a coffee table, circularly. This coffee table, introduced in evidence as an exhibit at trial, was made of very heavy hardwood, about 40 inches long and 28 inches wide. It was 14 inches high, an estimated 60 pounds in weight and rested in place in Deitz' living room on shag carpet, where the legs indented and the table stood rigid.

Deitz testified that he and the child's mother told the child to sit down and stop running around this coffee table, but the child kept running around it in a counterclockwise direction and, when "rounding" one corner of the table, the child lost her footing between the couch and the corner of the table. Deitz said he observed this action with his peripheral vision. First he heard the contact and then he saw the child falling. He and the child's mother got up immediately and went to the child, who was then lying on her side on the floor. Deitz and the child's mother picked the child up and pulled her pants down to look at her, since it sounded as if the child had hit her hipbone. There appeared to be no damage, but the child was knocked out of breath. Thereafter the child sat quietly for about five minutes. She then got up and began to run around again. Deitz said the child did not run directly into the corner of the table but rather hit the corner when she was "rounding" it and lost her footing. Deitz did not see exactly what part of the child's body made contact with the table, having said both that the child struck her left hipbone, or left hipbone area, on the table.

Mrs. Platter testified at trial that on the evening of February 1, 1979, the child was home at the Platter residence. She was irritable and did not want to eat. She was left in the care of defendant's father, Carl Platter,

whom the child called "grandpa." While Carl Platter watched television, he observed the child to be rather quiet, not running around. The child sat by him most of the evening.

On February 2, 1979, the child awoke at about 8:15 a.m. instead of her usual 7 a.m. She was hungry and ate. She declined the invitation of defendant's mother to go shopping with her and to take the child's mother to work. About 10:30 a.m. that morning, Mrs. Platter and Kathy Hubbard left the house and the child was left alone in the Platter home with defendant.

Mrs. Platter testified that, when she arrived home at about 2 p.m., defendant told her that the child had become sick. Mrs. Platter had an opportunity to observe the child, who was lying in bed in her nightgown. She didn't have a fever, but since she had vomited earlier, she was given only beverages to drink.

The child continued to show symptoms of illness throughout the afternoon and evening of February 2, 1979. Defendant and his fiancee later went to the drugstore and obtained Emetrol. The doctor was called, and he approved of the Emetrol. About 10 p.m. Mrs. Platter and the child's mother (who came home from work about 4:30 p.m.) checked on the child, who then looked pale and limp. They called defendant, who discovered the child was not breathing. Defendant administered mouth-to-mouth resuscitation to the child until the Carpentersville paramedics, called by Mrs. Platter, arrived. Mrs. Platter testified that the child's stomach, normal before defendant began mouth-to-mouth resuscitation, swelled tremendously after the first two breaths. Her son continued mouth-to-mouth for three or four minutes until the paramedic team arrived.

Defendant testified on his own behalf at trial. He stated that on February 2, 1979, he was living with his fiancee and his fiancee's daughter, Kristie, in the Carpentersville home of his parents, Carl and Loretta Platter. The child referred to him as "daddy" and he contributed to her support. His fiancee, Kathy Hubbard, was in the process of finalizing her divorce with her husband.

Defendant acknowledged that he had indeed given and signed a written statement in an interview with Carpentersville police on February 7, 1979. He testified that the statement was only about 80% accurate and contained a number of important omissions. First, defendant said, the written statement did not include any mention of the coffee table incident. Defendant testified that he had told the officers about the child's collision with the coffee table, but that they didn't want to hear about that, so it was not included in the typed statement. Secondly, the statement omitted any mention of the force he used in striking the child.

Defendant testified that he had told the police that he had merely slapped the child, but the written statement omitted any mention of the force used.

Defendant then recounted for the jury the events on the morning of February 2, 1979. He testified that his mother and sister took his fiancee to work and left him to babysit because the child wasn't feeling well. He got up about 10:30 a.m. The child was in the recreation room of the house, wearing her pajamas. Defendant got up, dressed, then watched television. Kristie was sitting on the floor playing with her magnetic toy. At about 11 a.m., he went upstairs to make lunch. After making lunch, he came downstairs at about 11:20 a.m. and told Kristie it was time to eat and clean up. Kristie started crying. Defendant testified that he got on the floor and asked her what was wrong. He held her in his arms, but she continued whimpering. She didn't want to pick up her toys. Defendant said he told her it was one of the things that she had to do. He again told her to clean it up, but the child started to walk away and "let out a holler." She didn't want to do it, so he went to give her a slap on the "butt." The child stopped crying and picked up her toys. According to defendant, his hand came into contact with the child's hip area. The child then sat down, and didn't fall. A while later, Kristie got sick. She vomited on the floor, and defendant cleaned it up. He then changed her clothes, put her in her nightgown, and put her to bed. Defendant's mother got home about 2:20 p.m. During the two-hour period defendant was alone with the child, he gave her a couple of glasses of pop. Defendant testified that she vomited up these beverages. When his mother got home, he told her the child had gotten sick. The child's mother got home about 4 p.m. The child stopped throwing up. They later called the doctor, and Emetrol was administered to the child. The child did not appear to be in pain.

At about 10 p.m., he noticed that Kristie wasn't breathing. He brought the child into the living room while his mother called the paramedics. He began to administer mouth-to-mouth resuscitation to the child. After the first two breaths, the child's stomach area "swelled up tremendously," about three times its size. The paramedics arrived very quickly and took the child to the hospital.

Defendant then testified about the four other alleged incidents of child abuse to which prosecution witnesses had testified. With respect to the testimony of Michael Denz, defendant testified that he spanked the child on the "butt" to get her to stay off the sharp-edged flagstone. She had been told many times not to play there because she was so clumsy. As to the statements of Mrs. Regan, defendant testified that he merely slapped her on the seat to teach her to stay out of the street. Defendant denied telling Debra Holder that he struck Kristie for not eating properly. Defendant said that it was Kathy Hubbard, not he, who made the

statement in question and that Kathy's answer was made sarcastically. Defendant also disputed Insco's testimony denying that he ever struck the child on the face. Defendant testified that on the occasion in question, he cracked the child "on the butt" at the request of the child's mother, who was doing the wash and had her hands full of bleach.

Dr. Kirschner, a defense witness, testified that he was familiar with the standards of the medical profession applicable to the performance of autopsies. He was retained by the defense in this case initially to assist in evaluating and interpreting Dr. Goodfellow's autopsy protocol. He reviewed Dr. Goodfellow's report and went to Sherman Hospital in Elgin, where he observed the actual internal organs of the child, further dissected them, made sections through the various organs, took tissue samples in order to make histology slides of his own, and spoke with Dr. Goodfellow. He made his own tissue slides and reviewed them along with the slides made by Dr. Goodfellow.

Dr. Kirschner testified that his own tissue slides were consistent with Dr. Goodfellow's slides. However, Dr. Goodfellow's official autopsy report contained no evidence of any histologic examination of the slides by Dr. Goodfellow, also testified to by the chief deputy coroner. Nor did Dr. Goodfellow request to observe Dr. Kirschner's slides.

On microscopic examination of the child's left adrenal gland, Dr. Kirschner found that the hemorrhage within the gland was between 36 to 72 hours old. This finding was based upon Dr. Kirschner's observation of the color and firmness of the blood. He observed a clot formation in progress, indicating the hemorrhage in the left adrenal was at least 36 hours old. The clot was organizing into the early stages of healing and repair which, in a child of this age, would not be seen earlier than 36 hours. Dr. Kirschner stated as an absolute that this clot could not be 12 hours old because the changes which occurred in its organization are known not to occur that rapidly.

Dr. Kirschner could not age the injury to the duodenum because of the absence of necrosis, that is, the absence of significant tissue death on either edge of the duodenum where it was severed. Likewise, Dr. Kirschner could not age the lacerations to the mesentery since the rupture was largely through the fat, which made it difficult to look at histologically, but he said it could be an early injury less than 24 hours old. Finally, the peritonitis was early, probably less than 24 hours old.

Dr. Kirschner's report contained two pages on his microscopic examination while Dr. Goodfellow's report contained no section on microscopic examination. Dr. Kirschner testified that a microscopic exam is very important in this kind of case in deciding at what time the injury occurred. Dr. Kirschner said Dr. Goodfellow's report was incomplete in this regard.

Dr. Kirschner further testified that, in his opinion, if this child sustained trauma at 11:40 a.m. on February 2, 1979, that trauma (*i.e.*, Norman's conduct) could not have been the cause of the injury to the child's adrenal gland because the injury to the adrenal had to be older than that. Dr. Kirschner said that what he was able to see microscopically could be seen by a hundred pathologists, if they were to look.

Dr. Goodfellow had earlier testified that all of the child's injuries occurred at the same time and were of the same age and were caused by a single trauma. Dr. Kirschner agreed with these findings, stating that the duodenal and mesentery injuries occurred at the time of injury to the adrenal gland because it would be difficult for a blunt trauma to the abdomen to produce a precise injury to the adrenal gland without causing other injury, since the adrenal is a small gland sitting on top of the kidney and relatively protected. The later appearance of the peritonitis was consistent and characteristic, breaking out into the abdominal cavity later.

Another defense witness was Dr. Thomas G. Baffes, Director of the Department of Surgery at Chicago's Mt. Sinai Hospital. Dr. Baffes did not make any personal examination of the organs of the child in this case but, rather, answered hypothetical questions as an expert witness based upon an assumed set of facts in evidence and Dr. Goodfellow's autopsy protocol. It was Dr. Baffes' opinion that the injury which caused the child's death occurred at the time she fell against the corner of the coffee table. His opinion was that Norman Platter's striking the child did not cause the child's injuries. He reasoned that such a blow from Platter would have thrown the child across the room, resulting in injury to the child in other areas of her body. Additionally, a blow from an open hand or closed fist would much more likely have injured the opposite side of the duodenum, the second portion, which is more exposed than the portion injured near the ligament of Treitz. Further, injuries of this type when produced by a blow from the hand are likely to rupture the spleen and liver, which are located right under the abdominal wall. In this child these organs were intact. Therefore, Dr. Baffes concluded, a sharp, directed, well-localized blow was required to produce this injury. Here, all of the injured organs were within a half-inch of one another, and situated very deep within the body. When Dr. Baffes assumed he was unaware of the age of the organizing hemorrhage in the left adrenal as testified to by Dr. Kirschner, it did not change his opinion. Dr. Baffes stated that the efforts of the paramedics to compress the child's chest and to resuscitate the child probably led to a lot of the findings in the chest, and that the duodenum might also have ruptured during the resuscitative efforts. The duodenum could have been partially ruptured earlier, and then fully ruptured during the administration of mouth-to-mouth resuscitation. Because the child bloated as mouth-to-mouth resuscitation was

being given, Dr. Baffes stated it was then that he would have to assume the duodenum ruptured. Had the child been struck with a forceful blow from the hand causing these injuries, Dr. Baffes would expect to find a larger bruise on the child.

## STATE'S REBUTTAL

In rebuttal, the State presented the testimony of Dr. John Raffensperger, a pediatric surgeon and head of general surgery at Children's Memorial Hospital in Chicago. Dr. Raffensperger testified that he had examined the details of the child's death, discussed it with Dr. Goodfellow, examined the internal organs of the child including the duodenum, and examined the X rays, and he stated he came to the same conclusion as did Dr. Goodfellow.

Dr. Raffensperger thought it significant that the amount of fluid present in the child's peritoneal cavity and chest amounted to 18% of her body weight, and that amount did not even take into consideration the fluid she lost through vomiting. He stated that it is lethal to lose an amount of fluid equal to 15% of body weight. Taking the whole injury together, he likened it in seriousness to losing an arm or leg.

He estimated that the type of force necessary to transect a duodenum would be that of the kick of a horse or an adult, the blow of an adult if hard enough, or the force of being hit by an automobile fender. This force would have to be directed at a point midway between the umbilicus and chest because it is at this point that the duodenum is fixed by the ligament of Treitz, and is unable to move out of the way of the force. Dr. Raffensperger stated that he had never heard of a duodenal injury being caused by the chest compressions utilized in cardiopulmonary resuscitation.

Dr. Raffensperger described the duodenum as two layers of muscle lined with mucosa, the wall of the duodenum being approximately 1/16 of one inch thick. By contrast, he commented that the peritoneum is the thickness of one cell, less than a sheet of paper. When the duodenum ruptures, the contents of the upper bowel flow out, the vast majority flowing into the peritoneal cavity, with some amount possibly entering the retro-peritoneal space.

The symptoms which the child would exhibit upon rupture of the duodenum were listed by Dr. Raffensperger as immediate intense pain, rapid pulse, drop in blood pressure, pallor, vomiting, and difficulty in breathing due to the air swallowed by the child entering the peritoneal cavity, and pushing upward on the diaphragm. After 12 hours the child would be at the least very sick, and possibly dead.

The prosecutor then posed for Dr. Raffensperger a hypothetical question similar to that posed by the defendant to Dr. Baffes. Dr. Raffensperger stated that in his opinion a 36-inch-tall child could not possibly

have ruptured her duodenum by colliding with a 14-inch-tall table since the child's duodenum, at 20 inches above floor level, would have been too high to have been injured by such a collision. Additionally, the doctor remarked that the child would have to be running "full tilt," and expressed surprise that the child did not faint as a result of this alleged collision.

In response to the hypothetical question, Dr. Raffensperger stated that it was impossible that the hypothetical collision with the table could have caused the child's death. He also observed that if the child had partially transected her duodenum, as was the defendant's theory, she would have had intense pain and vomiting, and would not have been eating. The doctor also testified that mouth-to-mouth resuscitation performed on the child could not have completed a partial transection of her duodenum, nor would the chest compressions have done so. Regarding the compressions, the doctor noted that the child's stomach was full of air, and the compressions could not have injured the duodenum.

Dr. Raffensperger was asked what kind of contusion could be expected on the child's abdomen as a result of the blow which caused the internal injuries. He replied that if the child died in less than 24 hours time from the striking of the blow, there would probably be just swelling since a bruise does not become black and blue until the following day. He also stated that the duodenum would break long before the damage to the body's external skin would appear.

On cross-examination, Dr. Raffensperger explained that a duodenal injury is a rare occurrence. He estimated that out of every 100 cases of blunt abdominal trauma, there would result 25 ruptured spleens, 25 ruptured livers, an assortment of other injuries, 8 or 9 bowel traumas, and only one duodenal injury. When he was asked if he ever failed to discover the cause of such injuries, the doctor replied that that only happened in cases of child abuse where the history of the injuries is confused or obscured.

## I.

Defendant's first argument is that the evidence was insufficient to prove him guilty of manslaughter beyond a reasonable doubt. It is his position that the evidence disclosed two possible causes for the victim's death: (1) the child's collision with the coffee table on February 1, 1979, or (2) defendant's striking of the child on the hip or stomach area on February 2, 1979. He argues that the evidence on these two possible causes was so conflicting, irreconcilable, and unsatisfactory that his guilt was not proved beyond a reasonable doubt.

We disagree. Although the medical evidence on the cause of death

was in conflict, it is well settled that a mere conflict in the evidence does not raise a reasonable doubt of guilt. (*People v. Gonzales* (1978), 60 Ill. App. 3d 980, 377 N.E.2d 91; *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644.) The credibility of an expert witness, and the weight to be accorded his testimony, is a matter for the trier of fact to determine. (*People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied* (1975), 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786; *People v. Goble* (1976), 41 Ill. App. 3d 491, 354 N.E.2d 108.) A reviewing court will reverse a jury's verdict only where the evidence is so improbable, conflicting, or otherwise unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99; *People v. Lindsey* (1979), 73 Ill. App. 3d 436, 392 N.E.2d 278.

In the instant case, the medical evidence was not so improbable, contradicting, or unsatisfactory as to raise a reasonable doubt of guilt. We first note that although each of defendant's medical witnesses testified that the child suffered the injuries causing her death in the collision with the coffee table, neither was able to explain satisfactorily why the decedent showed no symptoms of a duodenal injury until after the defendant had struck her. The lack of a satisfactory answer to this critical inquiry could probably be considered by the jury in evaluating the testimony of defendant's medical witnesses. On the other hand, the State's medical witnesses testified that the child died of a duodenal injury caused by a blunt trauma to the abdomen, and that death would have to occur within 12 to 16 hours after the injury was sustained. Defendant's striking of the child occurred well within this time frame. Moreover, the child showed symptoms consistent with a duodenal injury immediately after defendant struck her. We believe that the State's evidence on this point is sufficient to prove defendant guilty of the offense of involuntary manslaughter beyond a reasonable doubt.

Defendant also contends that Dr. Kirschner testified that, based on his microscopic examination of tissue samples, the injury to the child's adrenal gland occurred not less than 36 nor more than 72 hours prior to death. As Dr. Kirschner testified that, in his opinion, the injuries to the child's adrenal gland, mesentery, and duodenum all occurred at the same time, this would tend to eliminate defendant's actions in striking the child as the cause of death. However, Dr. Kirschner's testimony also tended to rule out the coffee table collision as the cause of death, as that incident occurred no more than 33 hours prior to death. This inconsistency with the known facts may, in the eyes of the jury, weaken the weight to be given Dr. Kirschner's testimony. Secondly, we note also that Dr. Kirschner's testimony was inconsistent in that he admitted that the injury to the mesentery could have been a recent injury, less than 24 hours. The jury

could thus rationally accord less weight to Dr. Kirschner's testimony, and we are of the opinion that the testimony of this witness does not raise a reasonable doubt of guilt.

Defendant's final point on this issue is that the testimony of Dr. Baffes raised a reasonable doubt of guilt. Dr. Baffes testified, in response to a lengthy hypothetical question given by defense counsel, that in his opinion the child's collision with the coffee table on February 1, 1979, caused the injuries resulting in her death. However, no case has been cited to us, nor have we found any, where the appellate court held that an expert's favorable testimony in response to a posited hypothetical question, standing alone, raised a reasonable doubt of guilt. As we noted earlier, the credibility of an expert witness is usually a matter for the trier of fact to determine. (*Mackins*; *Goble*.) The jury may determine what weight is to be given an expert's testimony by "* * * considering the ability and character of the witness, his actions upon the witness stand, the weight and process of the reasoning by which he has supported his opinion, his possible bias in favor of the side for whom he testifies, whether he is a paid witness, the relative opportunities for study or observation of the matters about which he testifies, and any other matters, which serve to illuminate his statements." (31 Am. Jur. 2d *Expert & Opinion Evidence* §181 (1967).) We note that in connection with the testimony of this witness, Dr. Baffes revealed on cross-examination that he had an incorrect notion of how the victim, Kristie Hubbard, had fallen against the coffee table. Given such facts, we believe that the weight to be accorded the testimony of Dr. Baffes was for the jury to decide.

We thus conclude that the evidence in this case was sufficient to prove defendant guilty of the crime of involuntary manslaughter beyond a reasonable doubt.

## II.

■■ Defendant's second argument is that the trial court erred in permitting a prosecution witness, Dr. Nervis, to testify that the victim, Kristie Hubbard, was suffering from "battered child syndrome." Dr. Nervis was a pediatrician who had researched extensively in the area of child abuse and who taught a course in that subject at a medical school. He testified that based upon his examination of the child on the night of her death, he was able to conclude that she was a battered child within the definition of the battered child syndrome. The State also elicited the opinion of Dr. Nervis regarding whether the child suffered from the battered child syndrome based on a hypothetical question which included reference to prior injuries the child had exhibited when she was examined by a doctor in August of 1978.

Defendant contends that the testimony of Dr. Nervis on battered

child syndrome was improperly admitted. He argues that this court's recent opinion in *People v. De Jesus* (1979), 71 Ill. App. 3d 235, 389 N.E.2d 260, which found the term battered child syndrome to be admissible as an accepted medical diagnostic term of art, must be read to limit the use of this term to the testimony of the examining physician. He asserts that Dr. Nervis made no such diagnosis during his examination of the child in the instant case, and thus should not have been allowed to testify that the child suffered from battered child syndrome at that time.

In our opinion, the trial court did not err in permitting Dr. Nervis to so testify. We do not read *De Jesus* as either holding or intimating that an expert's opinion, rather than diagnosis, of battered child syndrome would not be admissible into evidence at trial. As a general rule, expert opinion testimony is admissible in a criminal proceeding where there is a need for the experience and expertise of the witness to assist the court and jury in determining the factual issues in the case. (*People v. Sepka* (1977), 51 Ill. App. 3d 244, 259, 367 N.E.2d 138, 149; *People v. Mackins*.) We are unable to discern any reason for prohibiting a physician otherwise qualified in the area from giving an expert medical opinion that a child was suffering from "battered child syndrome." Moreover, as the State has pointed out, there are a number of decisions from other jurisdictions where an expert medical witness was permitted to testify at the time of trial to his opinion of the existence of battered child syndrome. (*E.g., State v. Wilkerson* (1978), 295 N.C. 559, 563-68, 247 S.E.2d 905, 908-11; *Commonwealth v. Labbe* (Mass. App. 1978), 373 N.E.2d 227, 230-31; *People v. Ellis* (1978), 41 Colo. App. 271, 273-74, 589 P.2d 494, 496; *State v. Goblirsch* (1976), 309 Minn. 401, 404-07, 246 N.W.2d 12, 14-15.) For these reasons, we find defendant's contentions in this regard to be without merit.

### III.

Defendant next argues that the trial court committed reversible error in refusing to instruct the jury on the doctrine of *in loco parentis*. Defense instruction No. 6, which the trial court refused to submit to the jury, reads as follows:

> "The Defendant in this case was in a position to *in loco parentis* to the Decedent, Kristie Hubbard. As such, the Defendant had the responsibilities, duties and rights of a parent, including the right of a parent to exercise reasonable discipline over the child. The Defendant's conduct toward the Decedent, Kristie Hubbard, is to be judged on the same basis as if the Defendant were the Decedent's parent."

It is undisputed that during those eight months, defendant contributed to the support of the child. He bought the child food and clothing, and made weekly room and board payments to his parents on behalf of

himself, the child and the child's mother. There was testimony from defense witnesses that he treated the child well and had authority from the child's mother to treat the child as his own, to instruct the child, and to use reasonable disciplinary measures with regard to the child. The child's mother was Norman's fiancee, and continued to be so throughout the trial.

Defendant argues that under these circumstances it was essential for the jury to be instructed that he had a right to administer reasonable disciplinary measures to the decedent for two reasons. First, if the jury had believed his testimony that he was merely disciplining the child, they may have nevertheless have concluded that he still had no right to even touch her, "* * * making any such touching recklessness as an unlawful battery and itself the basis for a finding of guilty to the crime charged." Secondly, defendant argues, if the jury found that the initial injuries to the child resulted from her collision with the coffee table, but also believed that he aggravated those injuries and contributed to the death of the child by striking her in the course of administering reasonable discipline, it may have improperly found him guilty of the crime of involuntary manslaughter.

In our opinion, the trial court did not err in refusing to give the above mentioned instruction. Whether or not the defendant was in a position of *in loco parentis* to the decedent, Kristie Hubbard, was not relevant to any material issue in the case. What was in issue was whether the defendant caused the death of Kristie Hubbard by striking her with a forceful blow to the abdomen. Defendant could argue that he was merely disciplining the child and that the blow was not forceful; he was not, however, entitled to an instruction that he had a right to administer discipline as if he were a parent.

The concerns cited to us by defendant are unfounded. Defendant predicates his argument on an assumption that the jury may have found him guilty even if they believed he was merely disciplining the child. However, the jury could find the defendant guilty only if they believed that he caused the death of Kristie Hubbard by striking her with a blow that was likely to cause death or great bodily harm. (Ill. Rev. Stat. 1977, ch. 38, par. 9—3.) The jury was properly instructed on the crime of involuntary manslaughter, and we will assume that the jury followed the instructions that were given. (222 *East Chestnut Street Corp. v. Murphy* (1945), 325 Ill. App. 392, 60 N.E.2d 450.) We thus find no basis for reversal on this point.

## IV.

Defendant next contends that the trial court erred in admitting testimony of other incidents of abuse of the decedent, Kristie Hubbard. In the

course of trial, the State presented testimony from several witnesses who related instances of the defendant's prior abuse of the child. Defendant claims that the court erred in allowing such testimony into evidence since it constituted evidence of other offenses. Defendant asserts that this testimony did not meet the test of admissibility since it was offered to prove intent, and the offense of involuntary manslaughter is one which does not require that the defendant have the intent to kill.

■■ While evidence of extra-indictment offenses is generally not admissible, there are several situations of exception. As the court stated in *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, 492, "[e]vidence which tends to prove a fact in issue is admissible though it may be evidence showing that the accused has committed a crime other than the one for which he is being tried * * *." There are certain definite areas of exception for evidence of other offenses, among them motive, intent, knowledge, identity, absence of mistake, *modus operandi*, and common scheme or plan. However, as the court noted in *McDonald*, "* * * it has been broadly held that evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime." *McDonald*, 62 Ill. 2d 448, 455, 343 N.E.2d 489, 493. See also *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

■■■ Defendant is correct in his contention that the "intent to kill" is not an element of the offense of involuntary manslaughter. (*People v. Vega* (1973), 16 Ill. App. 3d 504, 306 N.E.2d 718.) The crime of involuntary manslaughter occurs where death results from acts performed recklessly, but without the intent to injure. (*People v. Bolden* (1968), 103 Ill. App. 2d 377, 243 N.E.2d 687.) However, this is not determinative of whether evidence of other offenses may properly be admitted. While the State is not required to prove an intent to kill, it is still required to prove the existence of a mental state—in this case the mental state of recklessness. *People v. Singleton* (1976), 41 Ill. App. 3d 665, 354 N.E.2d 464.

■■ To obtain a conviction, it was necessary that the State show that acts (whether lawful or unlawful) performed by the defendant were the cause of the child's death, that such acts were likely to cause death or great bodily harm, and that such acts were performed recklessly. These were all facts in issue and matters controverted by the defendant. The evidence of the defendant's prior abuse of the child was therefore relevant to show that the defendant performed the act which caused the child's death (which he denied), that the act was likely to cause death or great bodily harm (which he denied), and that the act was performed recklessly (which he denied).

The defendant claimed that the child's fatal injury was incurred in her collision with the coffee table. He testified that he struck the child only lightly and accidentally missed hitting her buttocks when she turned,

his blow landing instead in the hip area. He in fact stated that he did not believe it proper to hit a child anywhere on its body except on the buttocks and denied ever having struck the child in the face. The evidence of other instances of the defendant's abuse of the child demonstrated that the defendant, contrary to his assertions, had struck the child on the face on other occasions. The evidence also indicated that when the defendant had struck the child in the past he had done so with an extreme amount of force, showing that his acts were likely to cause death or great bodily harm, and also showing the defendant to be reckless in performing such acts with such an unreasonable amount of force.

In *People v. Holland* (1973), 11 Ill. App. 3d 591, 595-96, 297 N.E.2d 310, 314, the court held that evidence of prior instances of abusive treatment of the child was relevant to show a continued course of conduct consistent with the victim's injuries and relevant to show the manner in which she was killed. The court also found the evidence probative of the defendant's guilt, and admissible to show his general course of conduct toward the child. Other courts, while not deciding the issue, have implicitly sanctioned the use of evidence of prior acts of abuse of a child by the person charged with killing the child. (See *People v. Huff* (1963), 29 Ill. 2d 315, 194 N.E.2d 230; *People v. Brown* (1967), 83 Ill. App. 2d 411, 228 N.E.2d 495; *People v. Tucker* (1969), 106 Ill. App. 2d 62, 245 N.E.2d 638.) We are of the opinion that the reasoning of *Holland* is sound, and we follow that decision in this case. We thus hold that the prior acts of abuse admitted into evidence were relevant to prove disputed facts in issue, including the mental state of recklessness, and hence were properly admitted.

Defendant also disputes the credibility of the witnesses who testified to the defendant's prior abuse of the child. He argues that the evidence showed only that the defendant disciplined the child. However, the credibility of the witnesses is a matter to be determined by the trier of fact (*People v. Rowe* (1977), 45 Ill. App. 3d 1040, 360 N.E.2d 436), and the defendant cannot preclude witnesses from testifying as to his abusive treatment of the decedent simply by denying those acts or denying that he used unreasonable force. Rather, it was for the jury to weigh the defendant's denials against the testimony of those witnesses who allegedly saw the defendant abuse the child and who heard the defendant admit prior acts of abuse. We find this argument to be without merit.

## V.

Defendant next argues that the trial court erred in denying his motion to exclude the testimony of Michael Denz. Denz, a prosecution witness, testified at trial that he had witnessed the defendant striking the decedent,

Kristie Hubbard, on an occasion prior to her death. According to Denz, he observed defendant pick up the child and spank her three times with great force. However, in a pretrial interview with defense counsel, Denz had indicated to him that the amount of force used by defendant was light. Defendant admitted striking the child on the date in question, but stated he merely lightly spanked the child for playing in an area where she had repeatedly been told not to play. Based on this conversation, defense counsel moved to exclude the testimony of Michael Denz at trial. This motion was denied.

On appeal, defendant argues that Denz' testimony was worthless and possibly perjurious, and for these reasons, it was error for the trial court to permit him to testify. It is clear that a prosecutor may not knowingly use false statements as evidence. (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *People v. Higgs* (1973), 11 Ill. App. 3d 1032, 298 N.E.2d 283.) Moreover, a prosecutor has a duty to correct a statement made by a witness under oath which the prosecutor knows to be false. (*Napue; Higgs.*) However, in this case there is nothing to suggest that the prosecutor knew Michael Denz' testimony was false. Moreover, it is clear from the record that defense counsel was aware the prosecutor had no reason to believe Michael Denz would testify falsely at trial.[1]

■■ Thus the question becomes whether a prosecutor is prohibited from presenting the testimony of a witness merely because that witness has previously made statements inconsistent with his in-court testimony. We think the question must be answered in the negative. (See *People v. Rosenborgh* (1974), 21 Ill. App. 3d 676, 690, 315 N.E.2d 545, 556 (prosecutor had no duty to correct allegedly false testimony of prosecution witnesses where there was no evidence of perjury).) The existence of a contradictory or conflicting statement made by a witness at some time prior to trial is not a basis for excluding his testimony. Any inconsistencies in the witness' statements are relevant to the credibility of the witness and are a matter of argument to the jury. Defendant here had the opportunity to attempt to impeach the witness Denz with his prior statement to defense counsel which related a less forceful blow from the defendant to

---

[1] In objecting to the presentation of Denz' testimony, defense counsel stated: "I am asking the Court to prohibit his testimony for the reason that there is sufficient evidence before the Court here in chambers that this witness has ° ° ° made out-of-court statements, one to a law enforcement officer, two to a lawyer which are completely at odds and inconsistent and the State is unable to demonstrate trustworthiness of either version of the story. And, therefore, to put this witness on the stand would be to put on completely untrustworthy testimony. And I believe that is akin to putting on—*I'm not charging knowing use of perjured testimony. I'm not charging that.* I'm charging something akin to it. Knowing use of worthless testimony which has a complete fifty-fifty possibility of being perjurious." (Emphasis added.)

the child, and he took advantage of that opportunity. Hence, we hold that the trial court properly denied the defendant's motion to exclude the testimony of Michael Denz.

## VI.

Defendant next argues that the prosecutor committed reversible error by referring in his opening statement to testimony which the trial court later refused to admit into evidence. In his opening statement, the prosecutor told the jury that he expected to present the testimony of Dr. Mark Smedley of Sherman Hospital in Elgin. He would testify that the decedent, Kristie Hubbard, was brought into the emergency room for treatment on January 4, 1978, and that she was covered with bruises around her ribcage, sex organ, and back, in addition to other injuries. When the State attempted to call Dr. Smedley to the stand, however, the trial court sustained a defense objection to the presentation of his testimony, ruling that the incident was too remote in time and that possible prejudice to defendant outweighed the probative value of the testimony.

■■ It is well established that the function of the opening statement is to acquaint the jury with the facts each party expects to prove in the course of trial. The opening statement should be brief, and general rather than detailed, and should contain an outline of facts which the prosecution in good faith expects to prove. (*People v. Bolton* (1976), 35 Ill. App. 3d 965, 343 N.E.2d 190.) It is improper, at least with foreknowledge, to include matters in an opening statement which are not thereafter proved. (*People v. Parks* (1977), 49 Ill. App. 3d 65, 363 N.E.2d 93; *People v. Butler* (1973), 12 Ill. App. 3d 541, 298 N.E.2d 798.) Absent deliberate misconduct by the prosecutor, however, the error is not grounds for reversal unless the reference resulted in substantial prejudice to the defendant. *People v. Sanders* (1980), 81 Ill. App. 3d 1001, 401 N.E.2d 1103; *People v. Bell* (1975), 27 Ill. App. 3d 171, 326 N.E.2d 507.

From the circumstances present in the case at bar, we think it is clear that the prosecutor acted in good faith when he referred to the testimony of Dr. Smedley in his opening statement. The defendant's motion *in limine*, which attempted to preclude the State from introducing evidence of prior instances of child abuse, had already been denied, and there was no reason for the prosecutor to believe that Dr. Smedley would not be permitted to testify. Thus we find no deliberate misconduct on the prosecutor's part. Moreover, we believe that this brief reference to a single instance of child abuse did not result in substantial prejudice to the defendant, or serve to deny him a fair trial. We therefore find no reversible error on this point.

## VII.

We next address defendant's argument that the trial court erred in permitting the State to ask a prejudicial question as to defendant's temper. During the re-cross-examination of defendant's mother, the following exchange occurred:

"[The Prosecutor]: Mrs. Platter, speaking of unstable, your son Norman has a violent and uncontrollable temper, isn't that true?
[Defense Counsel]: I object to that.
Mrs. Platter: No, it's not.
The Court: The answer will stand. She's answered."

Defendant thereupon moved to strike the question and answer from the record, and for a mistrial; both motions were denied.

■■ On appeal, defendant contends that it was error for the trial court to permit the State to ask the above-mentioned question, as there was no evidence that the defendant possessed a violent and uncontrollable temper. It is, of course, proper for an attorney on cross-examination to question a witness by assuming facts contrary to the witness' testimony on direct examination. However, if the assumed fact is not supported by the evidence introduced at trial, the examiner must be prepared to back up the implication of his questions with proof; otherwise, the attorney may successfully discredit the witness through innuendo rather than proof. Such a practice is highly improper. *People v. Payton* (1967), 82 Ill. App. 2d 51, 227 N.E.2d 87; see *People v. Woodburn* (1979), 75 Ill. App. 3d 532, 393 N.E.2d 1332.

■■ To the extent that the question inquired of the witness in this case whether defendant had a violent and uncontrollable temper, we think that the question was proper. From the evidence introduced by the State, it was a fair inference that defendant possessed a quick and violent temper, his denials notwithstanding. However, we agree with defendant that his objection to the question should have been sustained and the question and answer stricken. The prosecutor prefaced his question with a reference to mental stability; this insinuated that defendant was mentally or emotionally ill. This was both unfair and totally unsupported by the evidence in this case. Nevertheless, we think that the inference from the foregoing question and answer was harmless under the facts of this case and therefore does not constitute reversible error.

## VIII.

■■ Defendant's final argument is that the prosecutor made improper and prejudicial remarks in closing argument which deprived him of his right to a fair trial. Defendant asserts that the prosecutor improperly

implied that the defense had fabricated the coffee table incident in making the following statement:

"[The Prosecutor]: In this case if it wasn't the coffee table, they would have found a chair. They would have reached back and looked for a door, anything. Anything. To get away from the guilt object the unequivocal guilt of Mr. Platter in this case."

However, the defendant did not object to the prosecutor's remarks at trial. We thus hold that the argument based upon this allegedly prejudicial remark does not rise to the status of plain error and must be considered waived. *People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.

For the reasons stated above, the judgment of the Circuit Court of Kane County is affirmed.

Affirmed.

WOODWARD and VAN DEUSEN, JJ., concur.